**APPALACHIAN POWER COMPANY,
et al.**

**v.**

**The UNITED STATES.**

**No. 62–78.**

United States Court of Claims.

Oct. 17, 1979.

Brice M. Clagett, Washington, D.C., for plaintiff. Diane P. Wood, Washington, D.C., and A. Joseph Dowd, Gen. Counsel, American Electric Power Service Corp., New York City, of counsel.

Thomas W. Petersen, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant. David A. Watts, John G. DeKoster, Jan MacPherson, and Fred R. Disheroon, Washington, D.C., of counsel.

Before DAVIS, KASHIWA and BENNETT, Judges.

ON PLAINTIFF'S MOTION FOR PAR-
TIAL JUDGMENT ON THE PLEAD-
INGS AND DEFENDANT'S CROSS
MOTION FOR JUDGMENT ON THE
PLEADINGS

KASHIWA, Judge:

This case is the last phase of a protracted, but unsuccessful, effort by plaintiff, Appalachian Power Company (Appalachian),[1] to build and operate the Blue Ridge Pumped Storage and Hydroelectric Project (Blue Ridge Project) on the New River above Galax, Virginia. The project was initiated by preliminary plans in 1962 and a formal application in 1965. Like similar hydroelectric projects initiated on or about the same period of this project, plaintiff ran into difficulties.[2] Since the Congressional enactment of Pub.L. No. 94–407 (approved September 11, 1976), amending the Wild and Scenic Rivers Act of 1968, 16 U.S.C. § 1271 et seq., it is clear the proposed Blue Ridge Project will not be build. The question remaining for our decision is whether the enactment of Pub.L. No. 94–407 constituted, as plaintiff alleges, a taking of plaintiff's hereinafter described Federal Power Commission (FPC) license granting the plaintiff the right to build and operate the Blue Ridge Project. This question was recognized by Congress but left to the decision of this court.[3]

This taking issue is before the court on plaintiff's motion for partial judgment on the pleadings under Rule 38(c) of this court. The parties to the case agree that the question of whether defendant is liable is ripe for decision. Every fact necessary for the court's decision on the issue has been established by the pleadings, which makes Rule 38(c) the appropriate procedural vehicle. After carefully considering the parties' briefs and oral arguments, we hold in favor of defendant. There was no compensable taking.

Appalachian is a public utility company engaged in the business of providing electric power to customers in the States of Virginia and West Virginia. Its principal place of business is in Roanoke, Virginia. Appalachian commenced its effort to build the Blue Ridge Project on June 20, 1962, when it applied to the FPC for a preliminary permit under 16 U.S.C. § 798 (1976) to maintain priority of application for a license to construct the project. The FPC issued the preliminary permit on March 11, 1963.

Following the completion of feasibility studies, Appalachian filed on February 27, 1965, an application for a license to construct the Blue Ridge Project. The purposes of the project were to provide additional on-peak electric generating capacity

1. Appalachian is a wholly owned subsidiary of American Electric Power Company (AEP), an investor-owned public utility holding company. AEP owns all of the voting stock of seven operating subsidiaries which provide electric service throughout a wide area that includes portions of Indiana, Kentucky, Michigan, Ohio, Tennessee, Virginia, and West Virginia. The seven plaintiffs supply electric service in the areas above mentioned. These seven subsidiaries exchange electric power among themselves and are planned, designed, and operated as a single integrated system. The petition alleges that while Appalachian is the principal plaintiff herein, it is likely that a trial will reveal that some portion of the damages complained of was suffered by one or more of the co-plaintiffs. Co-plaintiffs are therefore joined as plaintiffs as their interests may appear, whether as equitable owners of property interests or contract rights taken or interfered with by the United States, as third-party beneficiaries of a contract breached by the United States, as within the class protected by statutory

rights referred to herein, or otherwise. Throughout this opinion the term "plaintiff" is used to refer primarily to Appalachian but to include co-plaintiffs as their interests may ultimately appear.

2. The High Mountain Sheep Project, mentioned in Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), was terminated by passage of Pub.L. No. 94–199, § 1, 89 Stat. 1117, establishing the Hells Canyon National Recreation Area, 16 U.S.C. § 460gg et seq. The Asotin Dam, authorized under provisions of the Flood Control Act of 1962, Pub.L. No. 87–874, 76 Stat. 1173, was also deauthorized by Pub.L. No. 94–199. The Buffalo National River, established by Pub.L.No. 92–237, 16 U.S.C. § 460m–8 et seq., deauthorized the Corps of Engineers Lone Rock Project and precluded a second project under study (Gilbert).

3. See 122 Cong.Rec. at H 8600, S 14932 (daily ed. 1976).

to meet future projected needs of customers of the American Electric Power System and to improve the reliability of the American Electric Power System. Hearings on the proposed project and license application commenced in May 1967 and continued for two years.

On October 1, 1969, the administrative law judge issued his initial decision on the proposed project concluding that: "[t]he modified Blue Ridge Project represents the maximum utilization of the applicable reach of the New River sub-basin above Galax, Virginia with optimum project benefits * * *. No alternative site or source would provide the needed power more economically." *Appalachian Power Co.*, Project No. 2317, 51 F.P.C. 1906, 1966–1967 (1974). Accordingly, the initial decision recommended that a license be granted to Appalachian for the project.

Following the initial decision recommending that the project be licensed, additional hearings and administrative proceedings were conducted; and the administrative law judge issued two more opinions reaffirming the recommendation to issue an FPC license to Appalachian. The FPC twice heard oral arguments on the case and the commissioners personally examined the proposed Blue Ridge Project site. All parties requesting to do so were permitted to intervene despite deficiencies inherent in some petitions and that they were filed several years after the original license application. Also, the FPC staff prepared and circulated a final Environmental Impact Statement on the proposed project on June 17, 1973. Parties were given the opportunity to cross-examine FPC staff witnesses with respect to the Environmental Impact Statement at further hearings in July 1973. Furthermore, parties were allowed to file additional direct evidence with the FPC as late as July 13, 1973. No such evidence was filed by any party.

On July 14, 1974, the FPC, in an unanimous decision, issued the license to Appalachian; but the license expressly provided that it would not become effective until January 2, 1975.[4] Appalachian formally accepted the license by action of its Board of Directors on June 20, 1974. North Carolina then sought judicial review of the FPC's action in the United States Court of Appeals for the District of Columbia, alleging procedural defects in the FPC's decision-making process.

The Blue Ridge license became effective on January 2, 1975, in accordance with its terms subject however, as shown hereafter, to review by the respective United States Courts of Appeals and the Supreme Court as expressly spelled out in 16 U.S.C. § 825*l* (1958), a specific Federal Power Act provision. Prior to the effective date of the license, North Carolina sought a stay of the FPC's licensing order from the Court of Appeals. On January 31, 1975, the court granted the stay, 29 days after the license became effective. On March 24, 1976, in *North Carolina v. FPC*, 174 U.S.App.D.C. 475, 533 F.2d 702 (D.C. Cir. 1976), the Court of Appeals vacated the stay it had issued pending the appeal and upheld the FPC's order granting the license.[5] Two days later the FPC declared that the license "is in effect." North Carolina then sought a writ of certiorari from the United States Supreme Court. 45 U.S.L.W. 3017 (1976).

---

4. The effective date provision of the license states:

> (D) The license granted herein shall become effective January 2, 1975, unless on that date there exists an Act of Congress that would delay or foreclose the Blue Ridge project.

The six-month delay in the effective date of the license was placed in the license to allow the 93d Congress to finish considering legislation which was pending before it. The pending legislation was similar to Pub.L. No. 94–407, 90 Stat. 1238, which Congress enacted in 1976.

The 93d Congress failed to enact the pending legislation and accordingly the FPC license became effective on January 2, 1975.

5. The circuit court's affirmance was with one minor modification. The modification was to require Appalachian to allow and to finance an archaeological excavation and salvage to be completed on the proposed dam site. This modification was subsequently incorporated into the FPC license for the Blue Ridge Project and accepted by Appalachian.

Before the Supreme Court considered North Carolina's petition for certiorari, Congress passed, and on September 11, 1976, the President signed, Pub.L. No. 94–407, 90 Stat. 1238, amending the Wild and Scenic Rivers Act of 1968, 16 U.S.C. § 1271 *et seq.* Section 1 of the Act added to the national wild and scenic rivers system "that segment of the New River in North Carolina extending from its confluence with Dog Creek downstream approximately 26.5 miles to the Virginia State Line." The Blue Ridge Project affected this segment. Section 2, set out in the margin,[6] rendered any FPC license ineffective for that portion of the river and provided that "no project or undertaking so licensed shall be permitted to invade, inundate or otherwise adversely affect such river segment."

Following the enactment of Pub.L. No. 94–407 the Supreme Court, following a procedure urged by the Solicitor General's office, granted North Carolina's petition for certiorari, vacated the judgment below, and remanded the case to the Court of Appeals for further consideration in light of Pub.L. No. 94–407. 429 U.S. 891, 97 S.Ct. 250, 50 L.Ed.2d 174 (1976). The Court of Appeals upon reconsideration concluded that North Carolina's challenge was moot and dismissed the petition for review.

Plaintiff filed its petition in this court on February 14, 1978.

Plaintiff's contention is that as of January 2, 1975, the FPC license for the Blue Ridge Project became effective. Once the license was effective plaintiff argues it became irrevocable for a term of 50 years under its express terms and the terms of 16 U.S.C. § 799 (1976).[7] In other words, once effective plaintiff maintains it had an exclusive statutory franchise to develop the Blue Ridge Project in accordance with the terms of the FPC license. Although plaintiff agrees Congress had the power to alter, amend, or repeal the Federal Power Act, 16 U.S.C. §§ 791, *et seq.*, after January 2, 1975, plaintiff submits that the amendment, alteration, or repeal of any provision would not have any retroactive effect (*i. e.*, preexisting licenses would still exist as issued).[8] Since the Blue Ridge license was outstanding and presumptively validly issued at the time Congress enacted Pub.L. No. 94–407, plaintiff contends that section 2, *supra*, note 6, of that enactment constituted a taking of the Blue Ridge Project license. Plaintiff concedes Congress had the power to enact Pub.L. No. 94–407 and take the outstanding license, but submits that the power company is entitled to receive just compensation for the taking under the terms of 16 U.S.C. § 807(a) (1968), which reads in pertinent part:

> * * * *Provided,* That the right of the United States or any State or munici-

**6.** Section 2 reads:

> "(2) In section 7(a), after the third sentence, insert the following: 'Any license heretofore or hereafter issued by the Federal Power Commission affecting the New River of North Carolina shall continue to be effective only for that portion of the river which is not included in the National Wild and Scenic Rivers System pursuant to section 2 of this Act and no project or undertaking so licensed shall be permitted to invade, inundate or otherwise adversely affect such river segment.' "

**7.** Section 799 reads:

> "Licenses under this subchapter shall be issued for a period not exceeding fifty years. Each such license shall be conditioned upon acceptance by the licensee of all of the terms and conditions of this chapter and such further conditions, if any, as the Commission shall prescribe in conformity with this chapter, which said terms and conditions and the acceptance thereof shall be expressed in said license. Li-

censes may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter, and may be altered or surrendered only upon mutual agreement between the licensee and the Commission after thirty days' public notice. Copies of all licenses issued under the provisions of this subchapter and calling for the payment of annual charges shall be deposited with the General Accounting Office, in compliance with section 20 of Title 41."

**8.** Plaintiff particularly relies upon 16 U.S.C. § 822 (1976) for this proposition. Section 822 reads:

> "The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter, or the rights of any licensee thereunder."

pality to take over, maintain, and operate any project licensed under this chapter at any time by condemnation proceedings upon payment of just compensation is expressly reserved.

Defendant counters that Congress has the power under the Commerce Clause of the Constitution to control the stream beds of navigable streams without liability. This is a recognized power. *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *Louisville Bridge Co. v. United States*, 242 U.S. 409, 37 S.Ct. 158, 61 L.Ed. 395 (1917).

The plaintiffs in both *Chandler-Dunbar* and *Louisville Bridge* held revocable licenses to build and maintain the structures involved in those cases. *Chandler-Dunbar, supra*, 229 U.S. at 68, 33 S.Ct. 667; *Louisville Bridge, supra*, 242 U.S. at 420, 37 S.Ct. 158. Plaintiff submits that revocability of the licenses involved in those cases makes both cases distinguishable from this case. Plaintiff argues that the license in this case was irrevocable—a fact the Supreme Court expressly recognized was not involved in *Louisville Bridge :*

> * * * We need not go so far as to say that Congress could not in any case by contract or estoppel prevent itself from modifying or revoking a regulation once made and substituting another in its place without compensation. * * * [*Id.* at 417, 37 S.Ct. at 160.]

Plaintiff relies in its argument of irrevocability on the following provisions of the Federal Power Act:

> * * * Licenses may be revoked only for the reasons and in the manner prescribed under the provisions of this chapter * * *. [16 U.S.C. § 799 (1976).]

> The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment or repeal shall affect any license theretofore issued under the provisions of this chapter or the rights of any licensee thereunder. [16 U.S.C. § 822 (1920).]

Plaintiff in discussing the foregoing statutory provisions says that an FPC license becomes irrevocable at some point in time under the express terms of 16 U.S.C. § 799 (1976), and after the license is vested with this irrevocable feature the licensee has the right to rely upon it in building and operating the licensed facility pursuant to the license terms. Plaintiff urges that once the license has become irrevocable it is clear that section 822 insulates it from subsequent legislation which amends, repeals, or revokes the Federal Power Act.

Defendant answers the foregoing argument of plaintiff, based on sections 799 and 822, by citing *Scenic Hudson Preservation Conference v. Callaway*, 370 F.Supp. 162, 171 (S.D.N.Y.1973), *aff'd per curiam*, 499 F.2d 127 (2d Cir. 1974), wherein it was held that subsequent legislation of general application is applicable to FPC licensees. In that case, Consolidated Edison argued that the application of the permit requirement of the Federal Water Pollution Control Act of 1972, § 404, 33 U.S.C. § 1344 (1977), to a project previously licensed by the FPC would violate section 28 of the Federal Power Act. The district court rejected this argument and held:

> Con Ed's final argument is that even if this conclusion is correct, § 404 cannot apply to a project such as Storm King, which was licensed prior to the passage of the Amendments, because section 28 of the Power Act provides:

> > "The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter, or the rights of any licensee thereunder." 16 U.S.C. § 822.

> The answer to Con Ed's argument that the 1972 Amendments to the Federal Water Pollution Control Act cannot, because of this section, affect its rights under a previously issued FPC license is that the Amendments are amendments to the Water Pollution Control Act and *not* to the Federal Power Act. The Amendments constitute law of general application which affect FPC licensees no more than any other economic group. We believe that § 28 was not intended to insu-

late FPC licensees from the effect of general Congressional legislation for the term of their licenses, but only to protect them from ex post facto law-making relating specifically to FPC license requirements. [370 F.Supp. at 171.]

We agree with the reasoning above quoted, which was affirmed by the Second Circuit.

Pub.L. No. 94–407 reads as follows:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Wild and Scenic Rivers Act (82 Stat. 905), as amended (16 U.S.C. 1271 et seq.) is amended as follows:

(1) In section 2 delete "Maine, and that segment of the Wolf River, Wisconsin, which flows through Langlade County," and insert in lieu thereof "Maine; that segment of the Wolf River, Wisconsin, which flows through Langlade County; and that segment of the New River in North Carolina extending from its confluence with Dog Creek downstream approximately 26.5 miles to the Virginia State line.".

(2) In section 7(a), after the third sentence, insert the following: "Any license heretofore or hereafter issued by the Federal Power Commission affecting the New River of North Carolina shall continue to be effective only for that portion of the river which is not included in the National Wild and Scenic Rivers System pursuant to section 2 of this Act and no project or undertaking so licensed shall be permitted to invade, inundate or otherwise adversely affect such river segment.". [Approved September 11, 1976.]

We find that Congress specifically intended by the Act to amend the Wild and Scenic Rivers Act (1968), 16 U.S.C. § 1271 et seq. Although plaintiff argues section 2 of the Act could just as easily have been codified in the Federal Power Act at 16 U.S.C. § 797(a) (1935), the language of the Act is plain and controlling.

It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dam and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes. [16 U.S.C. § 1271 (1968).]

And the purpose of the Act is stated in section 1(c) as follows:

The purpose of this chapter is to implement the policy set out in section 1271 of this title by instituting a national wild and scenic rivers system, by designating the initial components of that system, and by prescribing the methods by which and standards according to which additional components may be added to the system from time to time. [16 U.S.C. § 1272 (1968).]

Pub.L. No. 94–407 added approximately 26.5 miles of the New River in North Carolina, from Dog Creek downstream to the Virginia State line, to the national wild and scenic rivers system. Therefore, Congress decided that the New River at that point possessed outstanding "scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." We are not in a position to question such a decision of Congress. Clearly, the Wild and Scenic Rivers Act is a statute of general application and the New River segment of 26.5 miles pertinent herein was added to the list of segments of many rivers Congress heretofore chose to list.[9] The obvious purpose of Con-

9. Some of the rivers originally listed and later added to the list are: Elwen Point in Missouri, Feather in California, Rio Grande in New Mexico, Rogue in Oregon, Saint Croix in Minnesota

gress was to preserve all of the listed segments of rivers in the original act of 1968 and river segments added by a later Congress or by procedures afforded the states.

■ The Wild and Scenic Rivers Act is a statute of nationwide application and without any doubt it is of general application. Once a segment of a river is listed in the statute or later added thereto the numerous restrictive preservation features of the statute become effective with relation to the segment. Examples of such restrictive features include: (1) the prohibition of other federal departments or agencies (in addition to the FPC) from licensing water resource projects if they would have an adverse effect on scenic river values, 16 U.S.C. § 1278 (1976); (2) withdrawal from "entry, sale, or other disposition" of public lands within the authorized boundaries of any such river included in the scenic river system, 16 U.S.C. § 1279 (1968); (3) mineral activities which remain permissible must be conducted in accordance with regulations designed to effectuate the purposes of the Act, 16 U.S.C. § 1280 (1968); and (4) each segment of the scenic river system shall be administered to protect and enhance the scenic value which caused it to be included in the system, primary emphasis to be given to protecting its esthetic, scenic, historic, archaeologic, and scientific features, 16 U.S.C. § 1281 (1968). The Wild and Scenic Rivers Act is clearly a statute of greater scope and purpose than the 1965 Anadromous Fish Act, 16 U.S.C. §§ 757a–f, discussed in *Udall v. FPC*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), wherein the problem of upstream salmon migrants on the Snake River using fish ladders and those traveling downstream going through proposed turbines, resulting in high mortality, was considered in the revocation by the Court of the FPC license involved in that case. The Court in *Udall* stated:

* * * The grant of authority to the [FPC] to alienate federal water resources does not, of course, turn simply on whether the project will be beneficial to the licensee. Nor is the test solely whether the region will be able to use the additional power. The test is whether the project will be in the public interest. And that determination can be made only after an exploration of all issues relevant to the "public interest," including future power demand and supply, alternate sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife. [387 U.S. at 450, 87 S.Ct. at 1724.]

In other words the Federal Power Act is not immune from effects of other subsequent acts of Congress of general application. Licenses cannot be granted without considering the effects of such subsequent acts of Congress. In the case of the Wild and Scenic Rivers Act, the restriction to license is specific in that the Act prohibits licensing of listed segments of rivers and segments of rivers later added.

(a) The Federal Power Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act, as amended, on or directly affecting any river which is designated in section 1274 of this title as a component of the national wild and scenic rivers system or which is hereafter designated for inclusion in that system * * *. [16 U.S.C. § 1278.]

Certainly if the plaintiff's license for the Blue Ridge Project was irrevocable at the time Congress enacted Pub.L. No. 94–407 the question posed, but not answered, by the Supreme Court in *Louisville Bridge* would be squarely before us. We do not need to decide that question, however, for we find that plaintiff's license for the Blue Ridge Project was not sufficiently final at the time Congress enacted Pub.L. No. 94–407. Therefore, we hold that there was no taking of plaintiff's FPC license.

and Wisconsin, Wolf in Wisconsin, Snake in Idaho and Oregon, Flathead in Montana, Missouri in Montana, Obed in Tennessee, Pere

Marquette in Michigan, and Upper Delaware in New York and Pennsylvania.

We find that the license for the Blue Ridge Project was not irrevocable because the license was still subject to judicial review in the courts. 16 U.S.C. § 825*l* (1958) [10] allows the reviewing court to stay the effective date of a license pending final review and if, during the review process, it is shown that the FPC did not adequately protect the public interest or comply with its statutory charter, the reviewing court can vacate the license and order further proceedings. *Udall v. FPC, supra.*

We find that the irrevocable attribute of an FPC license does not vest until judicial review is complete or the time for such review has lapsed. This interpretation of the Federal Power Act is in accord with the rule of construction which the Supreme Court announced in *Louisville Bridge.* In that case the plaintiff was seeking to assert an irrevocable franchise to operate a bridge across the Ohio River—a franchise similar to the one plaintiff is asserting herein. The basis for the irrevocable franchise in *Louisville Bridge*, as in this case, was an act of Congress.[11] In construing the act involved in *Louisville Bridge*, the Supreme Court stated the following rule of statutory construction when the grant of an irrevocable franchise was involved:

     * * * But when private rights of an indefeasible nature are sought to be derived from regulatory provisions established in the exercise of this power, the case is peculiarly one for the application of the universal rule that grants of special franchises and privileges are to be strictly construed in favor of the public right, and nothing is to be taken as granted concerning which any reasonable doubt may be raised. * * * [*Id.* 242 U.S. at 417, 37 S.Ct. at 160.]

From the facts of this case it is manifest that judicial review was never completed. Before the judicial process of testing the validity of the issuance of the FPC license for the Blue Ridge Project was complete, Congress enacted Pub.L. No. 94–407. Although plaintiff correctly articulated the review standards exercised by courts subjecting final administrative decisions to judicial review, this court's experience in applying identical standards establishes that the reversal of an agency's final decision is not as unusual as plaintiff suggests. *E. g., Macke Co. v. United States*, 467 F.2d 1323, 199 Ct.Cl. 552 (1972); *Sylvania Electric Products, Inc. v. United States*, 458 F.2d 994, 198 Ct.Cl. 106 (1972); *Reil v. United States*, 456 F.2d 777, 197 Ct.Cl. 542 (1972); *Gerace v. United States*, 194 Ct.Cl. 1031 (1971); *DeVito v. United States*, 413 F.2d 1147, 188 Ct.Cl. 979 (1969). And since we hold that the irrevocable attribute of the FPC license does not vest under the terms of the Federal Power Act until the validity of the issuance of the license has been completely tested or the time for judicial review has lapsed, Congress had the power and the right to amend the Wild and Scenic Rivers Act to include the New River as it did without becoming liable for just compensation under the terms of the Federal Power Act.

Because of the disposition of the case in the foregoing manner, we need not consider the issue raised by defendant as to whether plaintiff is required to secure a permit under the Federal Water Pollution Control Act of 1972, § 404, 33 U.S.C. § 1344 (1977), and its effect on the present case.

---

**10.** Review by the Supreme Court is specifically provided in the following language:

     " * * * The judgment and decree of the [circuit] court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 346 and 347 of Title 28. [16 U.S.C. § 825*l* (b).]

**11.** The statute involved in *Louisville Bridge* differs from the statute, Federal Power Act, involved herein. The difference is that the stat-

ute involved in *Louisville Bridge* did not contain any provision expressly stating that the franchise was irrevocable. Nor did it contain any provision stating whether Congress could repeal or revoke the franchise. The Federal Power Act contains such express provisions. However, these provisions must be interpreted to establish when the irrevocable attribute of an FPC license vests. Although there is some difference in the statutory provisions between the cases, the rule of construction set forth in *Louisville Bridge* is equally applicable in this case.

## CONCLUSION

For the foregoing reasons, we grant defendant's cross motion for judgment on the pleadings and deny plaintiff's motion for partial judgment on the pleadings. The petition is dismissed.