## SAINT FRANCIS MEMORIAL HOSPITAL

### v.

### The UNITED STATES.

No. 421–79C.

United States Court of Claims.

May 6, 1981.

---

Patric Hooper, Los Angeles, Cal., atty. of record, for plaintiff. Weissburg & Aronson, Inc., Los Angeles, Cal., of counsel.

Benjamin F. Wilson, Atlanta, Ga., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant. S. Raenele Cote, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHI-WA, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This dispute turns on the method of reimbursement to a Medicare provider for interest payments made in 1966–1968 on a construction loan for a replacement hospital which was not ready or used until after that period. The hospital asserts that it is entitled to reimbursement for those payments as made, while the Government's position is that the payments for that period should be capitalized, added to the cost of the new building, and amortized over time. The issue is properly presented on cross-motions for summary judgment. We hold for the defendant.

## I

Plaintiff Saint Francis Memorial Hospital, a San Francisco non-profit corporation which is a provider under the Medicare program, 42 U.S.C. §§ 1395 *et seq.* (1970) (amended 1976 & Supp. III 1979), seeks reversal of reimbursement audit adjustments made by the Secretary of the Department of Health, Education and Welfare (now Health and Human Services) acting through the Blue Cross Association, which itself acted via its local plan, Hospital Service of California. These adjustments resulted in a smaller Medicare reimbursement for 1966–1968 than the hospital had sought.

Before the Medicare program began in 1966, plaintiff planned to build a new facility replacing the building it was then using. It obtained a construction loan for that purpose and the replacement facility was in the process of construction all during the years here involved—1966–1968. Construction was completed and patients transferred in January 1969. Meanwhile, Saint Francis paid substantial amounts of interest on the construction loan in 1966, 1967 and 1968. During that time Medicare patients were cared for in the old building.

The disagreement arises because Saint Francis treated the interest payments made during the 1966–1968 construction period as a current expense calling for current reimbursement for those years, and Blue Cross later required that the payments be capitalized and recovered over the life of the new facility. Saint Francis' allowable costs for 1966 to 1968 were reduced from $571,926 to $94,071. It appealed that decision to the Blue Cross Association Medicare Provider Appeals Committee which sustained the intermediary's adjustments.

Saint Francis then took its case to the District Court for the Northern District of California, and obtained a ruling in its favor. *Saint Francis Memorial Hospital v. Weinberger*, 413 F.Supp. 323 (N.D.Cal. 1976). On the Government's appeal, the Ninth Circuit held that the District Court lacked subject matter jurisdiction over the

claim, and remanded it for transfer to the Court of Claims. No. 73–0495 (9th Cir., filed July 10, 1979). The current case is the result.[1]

The controversy is narrow. All are agreed that recovery for interest payments is a proper part of Medicare reimbursement. 42 C.F.R. § 405.419(a).[2] The dispute is the method and time for reimbursement—current expensing or capitalization over time. Defendant maintains that capitalization is demanded by Section 206 of the Provider Reimbursement Manual (Health Insurance Manual No. 15) (issued in 1968–69) which admittedly requires capitalization. The claimant says, on the other side, that Section 206 is invalid, in any event cannot be applied retroactively to interest payments made and expensed in 1966–1968 before the Manual was issued, and plaintiff's interest payments were reimbursable under the Medicare law governing 1966–1968.[3]

The relevant parts of Section 206 provide:

*Interest During Period Of Construction*

Frequently, providers may borrow funds to construct facilities or to enlarge existing facilities. Usually, construction of facilities will extend over a long period of time, during which interest costs on the loan are incurred. *Interest costs incurred during the period of construction must be capitalized as a part of the cost of the facility. The period of construction is considered to extend to the date the facility is put into use for patient care.*

If the construction is an addition to any existing facility, interest incurred during the construction period on funds borrowed to construct the addition must be capitalized as a cost of the addition. After the construction period, interest on the loan is allowable as an operating cost. (Emphasis added).

We first discuss (Part II, *infra*) the prospective validity of Section 206 without regard to the problem of retrospectivity occasioned by the fact that the directive was issued in 1968–69 and the interest payments involved here were made in 1966–68. We proceed then (Part III, *infra*) to consider the harder problem of retrospectivity in the light of Saint Francis' particular circumstances.

## II

Saint Francis levies attacks on both the content of Section 206 (viewed prospectively) and on the procedure by which it was adopted, but those challenges do not destroy the provision.

A. The validity of the contents of Section 206 was upheld in *Good Samaritan Hospital, Corvallis v. Mathews*, 609 F.2d 949, 954–56 (9th Cir. 1979), squarely considering that problem in a case on all fours with this one (except for the retrospective aspect).[4] That court ruled that the Secretary of HEW could reasonably read the Medicare statute and regulations as authorizing capitalization of construction loan interest, rather than current expensing. We agree.

The legislation expressly prescribes, first, that the cost reimbursement regulations should take into account that Medicare

1. We have, of course, considered the District Court's opinion but it plainly does not bind us and it cannot be taken as a true precedent. *See Faith Hospital Ass'n v. United States*, 218 Ct.Cl. ——, ——, 585 F.2d 474, 478 (1978).

2. Medicare regulations, originally codified in 1966 under Title 20 of the Code of Federal Regulations, can now be found (since 1977— *see* 42 Fed.Reg. 52826 (1977)) under Title 42.

3. The Medicare share of the amount claimed is $246,172.70, and plaintiff was allowed $39,-887.24. What is at stake in the end appears not to be the difference between these two figures, since the plaintiff will presumably re-

cover the entire amount eventually (to the extent it participates in the program), but rather the present value of $246,172.70 paid now as opposed to the present value of the Medicare share as determined each year and paid back over the useful life of the building without interest.

4. In that case, the application of Section 206 was wholly prospective since the construction-loan interest was paid and expensed by the provider in 1973 and 1974, some time after the Provider's Manual (including Section 206) had been issued in 1968–69.

should cover only costs respecting Medicare patients while, on the other hand, non-Medicare patients should not bear Medicare costs, and, second, that "the principles generally applied by national organizations or established prepayment organizations" should be considered. 42 U.S.C. § 1395x(v)(1) (1970) (amended 1976 & Supp. III 1979). The Act also emphasizes the "reasonable cost of such services." 42 U.S.C. § 1395f(b) (1970) (amended 1976 & Supp. III 1979). Implementing these several standards, the regulations at all pertinent times emphasized accounting practices "which are widely accepted in the hospital and related fields" (42 C.F.R. § 405.406(a)) and called for reimbursement of "necessary and proper" costs, which "are usually costs which are common and accepted occurrences in the field of the provider's activity" (42 C.F.R. § 405.451(b)(2)). Against this background, the Secretary could rationally conclude that expensing should be prohibited because Medicare patients would not use the new or expanded facility during construction and before it was put into patient use. During that time, full interest costs could well be considered as not actually incurred or tied to current Medicare use and therefore as unreimbursable under the Act and the regulations. Conversely, capitalization over the life of the new facility can properly be thought to link the interest costs more directly to the Medicare users of that facility; in particular, a capitalization practice avoids the problem of a Medicare provider's leaving the program or lessening its participation before Medicare patients would use the new hospital. Moreover, as plaintiff's own experts agreed, and the Appeals Committee found, capitalization is an accepted accounting practice (though probably not the only one).[5]

As did the Ninth Circuit in *Good Samaritan*, we accept the Secretary's position that Section 206 is a reasonable implementation of the statute and regulations.[6] Even though there may be differing accounting theories, the administrative judgment as to which of the accounting methods "most appropriately implements the principles of reimbursement under the Medicare Program is entitled to deference." *Gosman v. United States*, 215 Ct.Cl. 617, 632, 573 F.2d 31, 41 (1978). The same deference is due all the formal administrative interpretations of the Medicare program, so long as they are reasonably related (as here) to the purposes of the statute and not in conflict with it. *See Johnson's Professional Nursing Home v. Weinberger*, 490 F.2d 841, 844 (5th Cir. 1974).[7]

■ B. On the procedural level, Saint Francis insists that Section 206 was invalidly adopted because the Secretary, in promulgating the Provider's Manual (of which Section 206 is a part), admittedly did not follow the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553 (1976) (which call for notice to, and an opportunity to comment by, interested parties before rules are promulgated). These rulemaking provisions do not apply, however, to rules relating to "benefits". 5 U.S.C. § 553(a)(2). *Good Samaritan* expressly held Section 206 within this "benefit" exception, and we have no occasion to disagree. *See also Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1082–1084 (D.C.Cir.1978), to comparable effect.[8]

---

5. It is noteworthy that the American Hospital Association's published view is that capitalization should be employed by hospitals constructing new facilities. Plaintiff attacks this announcement as not well-considered, but the fact is that it existed and could properly be taken into account by the Secretary.

6. *Good Samaritan* rightly points out that there is "nothing to suggest that the erosion of inflation on the value of dollars was an element which was considered by the Congress as a cost or otherwise." 609 F.2d at 956.

7. It is worth pointing out that the District Court, in its vacated *Saint Francis* decision (Part I, *supra*) on which plaintiff relies heavily, did *not* hold that Section 206 was unreasonable or arbitrary in content when applied prospectively.

8. The Ninth Circuit's *Good Samaritan* decision overruled, in effect, one of the earlier District Court *Saint Francis* holdings (Part I, *supra*), *i.e.*, that Section 206 was invalid (even prospectively) because HEW failed to comply with the APA's rulemaking provisions (*see* 413 F.Supp. at 327–332).

## III

The troubling question is the retrospective application of Section 206, issued in 1968–69, to plaintiff's interest payments in 1966–1968.[9] Saint Francis' argument is that, whatever may be true of providers who acted after and in the light of Section 206 such as the Good Samaritan hospital, plaintiff was authorized by the Medicare law governing in 1966–1968 to expense its construction-interest payments for Medicare purposes. This contention rests on three pillars: (a) while the Medicare regulations in 1966–1968 did not treat specifically with the precise problem of capitalization vs. expensing for construction-loan interest, they did allow (in general) reimbursement in some form of such interest,[10] and the regulations also authorized providers to continue accounting practices they had previously followed if those methods were widely accepted in the hospital (and related) fields, and if they were not in conflict with the statute or a specific regulation, (b) Saint Francis had consistently followed the practice of expensing annually its interest payments on capital loans, and (c) because the then-issued directives (and those of which plaintiff was aware) did not cover the precise problem (in 1966–68) and because there were conflicting views on capitalization vs. expensing, plaintiff could properly follow its own past practice (which accorded with one of the accepted accounting positions).

The fundamental regulation (outstanding in 1966–1968) which Saint Francis invokes, in taking this position, is 42 C.F.R. § 405.-406(a):

> (a) General. The principles of cost reimbursement will require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. *Standardized definitions, accounting, statistics, and reporting practices which are widely accepted in the hospital and related fields are followed. Changes in these practices and systems will not be required in order to determine costs payable under the principles of reimbursement.* Essentially, the methods of determining costs payable under title XVIII [Medicare] involve making use of data available from the institution's basis accounts [basic accounts in 20 C.F.R. (*see* n.2 *supra*)], as usually maintained, to arrive at equitable and proper payment for services to beneficiaries. (Emphasis added).[11]

The argument is, then, that § 405.406(a) permitted a provider to continue to follow its past accounting practices, as long as they are accepted in the field and not in conflict with the statute or regulations. Thus, if a provider had borrowed money for comparable construction in the past and expensed the interest, it could continue (plaintiff says) to expense interest and be reimbursed for it under the Medicare program. In the light of this provision, Saint Francis continues, the requirement in Section 206 that interest on construction loans be capitalized changes drastically the im-

---

Another exception to the APA's rulemaking requirements—"interpretative rules," 5 U.S.C. § 553(b)(A)—is more fittingly touched upon in our discussion of the plaintiff's claim of unlawful retroactivity. *See* n.17, Part III, *infra*. (*Good Samaritan* did not reach this exception. 609 F.2d at 954). The same is true of the APA provision that "substantive rules of general applicability" shall be published in the Federal Register, 5 U.S.C. § 552(a)(1)(D) (1976), which we consider at the end of Part III, *infra*.

**9.** As pointed out *infra*, the same capitalization rule had been in effect since the beginning of Medicare in 1966, through Intermediary Letter No. 51, but we accept plaintiff's representation that it was not aware of that letter (which was not sent to it or published) during the time plaintiff paid and expensed the construction interest for 1966–1968.

**10.** As indicated *supra* in Part I, text at n.2, this proposition is correctly accepted by both parties.

**11.** Saint Francis also refers to regulations stressing "current" costs: 42 C.F.R. § 405.-402(a) (payments to be made on the provider's "current costs * * * rather than costs of a past period") and 42 C.F.R. § 405.402(b)(1) ("current payment" of reimbursed costs). But it is plain that, without the authorization in § 405.-406(a) to follow actual past practices, these other regulations would be of minimal help to plaintiff in its retroactivity challenge. The content of "current" costs is not at all precise but is subject to much interpretation in the light of the general statutory guidelines.

pact of the 1966–68 regulations since, in contrast with § 405.406(a), it would require those providers which expensed comparable interest in the past to change their accounting methods and instead to capitalize interest. This change is urged to be so severe as to prevent its retrospective application to the past transactions in this case.[12]

    For us, the prime key in examining this argument is the validity of Saint Francis' claim that by 1966–1968 the hospital had had a long-standing practice of expensing interest in capital or construction loans comparable to that involved here—construction of a replacement hospital building. On the basis of the record (supplemented by inquiry at oral argument) we think that Saint Francis has failed to show that it had any prior experience with capital improvements like or similar to the construction of a new facility, entailing the provision of new or additional bed-space for the patients which would concededly not be available for patient use during the construction period or the three years involved here.[13] So far as plaintiff has shown, its pre-1966 experience with "capital" expenditures did not include construction loans for a new hospital, for additional bed-space, or for other major new facilities which patients would not use at all during a long construction period (here three years).

In this posture of the case, we do not have the circumstances posited by Saint Francis—a prior accounting practice directly inconsistent with Section 206 but consistent with the then prevailing (1966–1968) regulations. Rather, we have a situation as to which, at best, the prevailing regulations were ambiguous and imprecise, giving only broad guidance to the plaintiff, since it had no real prior practice of its own on which to rely for expensing these interest payments under the regulations' permission to continue past practices. The sum of it is that, at that time, the claimant had no relevant past experience and the regulations were so general and inexact that they could easily be interpreted against Saint Francis' proposed practice in this specific situation. Plaintiff had no reason to expect that its different and narrower past practice would necessarily carry over to the building of a replacement hospital. It is not hard or irrational to differentiate between smaller-scale "capital" expenditures for items which perhaps may be available within the year, and the major project of constructing a new hospital, or adding new bed-space, which would not and could not be used for a much longer period.[14] Plaintiff knew, in 1966–1968, that no Medicare patients would use the new facility during that period and it also knew

12. This was the position ultimately taken by the District Court in its *Saint Francis* holding (Part I, *supra*). *See* 413 F.Supp. at 332–335.

13. The Committee hearing plaintiff's appeal from the fiscal intermediary's decision found that "the provider further demonstrated that it had been its long standing policy prior to the enactment of Medicare to expense interest during the period, rather than to capitalize it." Record at 3. However, the Committee made no specific findings describing the items for which interest was expensed. Similarly, in the transcript of the hearing, the plaintiff's witness refers only to expensing of interest on loans "applied to capital purposes." Record at 74. No specifics were offered. In the District Court judgment previously obtained in this case but vacated for lack of jurisdiction, *supra*, Part I, 413 F.Supp. 323, the court accepted the Committee's finding that the plaintiff had prior experience with capital loans but again made no specific findings concerning their nature. At oral argument before this court, the attorney for the plaintiff was specifically asked

whether any of the past capital expenditures concerned additional or replacement bed-space (or comparable major improvements spread out over years), and he was afforded an opportunity to submit a supplementary memorandum for the same purpose. Counsel did not suggest orally that there had been prior expenditures for adding or replacing bed-space, and we have since received nothing on the subject from the plaintiff. Accordingly, we must assume, because the plaintiff has not provided us with the necessary information to satisfy its burden of proving its past practices, that Saint Francis had no prior experience with capital improvements comparable to the replacement construction involved in this case.

14. Section 206 covers interest on loans to "construct" or to "enlarge" facilities and speaks of the "period of construction." It expressly contemplates the construction time as being the period during which Medicare patients will not be using the new facility.

(or should have realized) that the Medicare Act forbade reimbursement of costs not incurred by Medicare patients. This should, at the very least, have indicated to plaintiff the existence of a serious problem on the method of Medicare reimbursement of the interest payments for 1966–68.

■ Reliance on one's own interpretation of an imprecise regulation does not create an entitlement based on that interpretation, or a violation of due process when the administrator or court adopts another reading. As Professor Kenneth Davis puts it, "[r]etroactive clarification of uncertain law ordinarily involves no unfairness. It is retroactive change of settled law, not retroactive settling of unsettled law, which may produce unjust results." K. Davis, Administrative Law Text, § 5.05 at 135 (3rd ed. 1972). *See also Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 983–84 (5th Cir. 1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1081 (1st Cir. 1977); *Summit Nursing Home, Inc. v. United States,* 215 Ct.Cl. 581, 592–95, 572 F.2d 737, 742–44 (1978); *Gosman v. United States, supra,* 215 Ct.Cl. at 630–31, 573 F.2d at 39–40 (1978).

We believe that, faced as it was with a new problem for which the regulations did not give any clear answer and the opposing position had real substance, plaintiff could not proceed on its own without taking the chance that the Secretary might later adopt the different view (and the courts uphold it). Plaintiff should, at the least, have made an inquiry to its intermediary or the Secretary, seeking clarification or amplification of the statute and regulations.[15] There is no evidence, and we have no reason to believe, that Saint Francis made any such inquiry, but the fact is that the Secretary had already expressed his opinion plainly on the precise issue in Intermediary Letter No. 51, which was issued to intermediaries on June 14, 1966, by the Bureau of Health Insurance of the Social Security Administration.[16] The strong likelihood is that, if plaintiff had made proper inquiry, the intermediary or the Department would have responded that the Secretary expressly considered capitalization the proper method to account for the interest paid during the construction period for Saint Francis' replacement facility.[17] If plaintiff had thus discovered the Secretary's position—as we think it should and would have—it could have taken the steps it now says it would have taken if it had earlier learned the Secretary's view (e. g. by obtaining an additional loan to cover the capitalized interest payments).

**15.** If inquiries had been made, and no clarification were offered or the provider were encouraged to proceed as it saw fit, then the retrospective application of a new rule might create inequities not present here. *See,* for example, *Columbia Heights Nursing Home, Inc. v. Weinberger,* 380 F.Supp. 1066 (M.D.La.1974) (an agency cannot retroactively apply a new system of cost allocation when the provider had been following a system established and approved by the fiscal intermediary). *See also* n.19, *infra.*

**16.** The letter was therefore issued before Medicare became effective on July 1, 1966. There is no proof that this letter was normally made available to providers in 1966–1968, and plaintiff denies receiving it or knowing about it.

**17.** The very same considerations which we have discussed in this Part III impel the conclusion that Section 206, *as applied to this plaintiff,* should be considered an "interpretative" rule, excepted from the APA requirements for rule-making by 5 U.S.C. § 553(b)(A). With the imprecision of the statute, plaintiff's lack of comparable prior experience, and the failure of the 1966–1968 regulations to cover squarely the treatment of plaintiff's construction-loan interest, the Departmental position on that interest was not a substantive change but an interpretation of the broad provisions of the Medicare Act and of the reimbursement regulations. Section 206, like the administrative rules considered in *Gosman,* "effected no change in policy or in law; it explained what the more general terms of the statute and the regulation could already be deemed to require. * * * Nothing was taken away from plaintiff by the specific provision of the Provider Reimbursement Manual." 215 Ct.Cl. at 630–31, 573 F.2d at 39–40. Accordingly, for this plaintiff (and for all others like it) the Secretary did not have to employ the APA rule-making steps in issuing Section 206. This is an independent ground, additional to the "benefit" exception applied to Section 206 in Part II, *supra.*

Particularly in this light, Saint Francis cannot rely on its technical contention that Section 206 is inapplicable to it because the Manual (of which Section 206 is part) was not published in the Federal Register. The Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(D), calls for Register publication of "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency * * *." No person may "be adversely affected by" matter required to be so published "[e]xcept to the extent that a person has actual and timely notice of the terms thereof * * *." 5 U.S.C. § 552(a)(1). Even if Section 206 should have been published when issued, there was no violation of § 552(a)(1) in this instance. The Manual and Section 206 were issued in late 1968 and early 1969,[18] and plaintiff became aware of it at about that time. This was plainly a substantial period after the interest payments were made in 1966–1968, and even if Section 206 had been published in the Federal Register when issued the plaintiff would have been in no different position as to those past payments. The core of the publication re-

quirement is that a person should not be bound by an administrative provision if he had no awareness of it (because the requirement was not published) and would have altered his situation if he had known at the time of its existence. That was not true here when the Manual and Section 206 were issued in 1968–69. Plaintiff became aware of the provision shortly after its issuance, but it was then too late. It cannot be forgotten, moreover, that proper inquiry would most probably have elicited the existence of the forerunner of Section 206—Intermediary Letter No. 51—though we are not saying that plaintiff itself should otherwise have known of the letter.[19]

For these reasons we hold that Saint Francis could not be reimbursed in 1966–1968 for all the construction-loan interest payments it made and sought to expense for those years. The administrative decision must be sustained.[20] Defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied. The petition is dismissed.

---

**18.** The Manual appears to have been issued late in 1968 and made available to providers early in 1969.

**19.** Our situation differs sharply from that in *St. Elizabeth Hospital v. United States*, 214 Ct.Cl. 322, 558 F.2d 8 (1977), where the hospital's notice of the unpublished provision was untimely. A two-year limitation on making changes in depreciation methods was adopted by the agency but not published in the Federal Register. Under the new requirement, that plaintiff had to come forward with any change by 1968 instead of 1976, the date given in the applicable, previously published regulation. The plaintiff did not learn of the new deadline in time to meet it, although (in contrast to the case before us) publication would have put plaintiff on notice in due time. As a result, the court would not apply the Manual section (not published in the Register) to the hospital. 214 Ct.Cl. at 329–31, 558 F.2d at 13–14. There was no showing, and no reason to believe, that that plaintiff should not have relied on the published allowance of a 10-year period for depreciation.

Likewise, we do not understand the discussion in *St. John's Hickey Memorial Hospital, Inc. v. Califano*, 599 F.2d 803, 814–15 (7th Cir.

1979), as calling for Federal Register publication for Section 206 before it could be applied to a case like the present. In *St. John's*, unlike the current problem, the provider had been expressly told by the intermediary that its expenses would be reimbursed, and the policy position on which the Government later relied for the opposite position was not given either to the intermediaries or to the providers. Moreover, in contrast to the present case, the court held the new policy position incorrect on its merits.

**20.** Plaintiff's petition contained a claim of unconstitutional taking which we think it dropped in the course of the proceedings before us. In any case, our resolution of the retroactivity claim would prevent plaintiff's recovery under a taking theory, since plaintiff did not have an interest tantamount to a property right in the accounting method it used for its construction financing involved here. *See, e. g., Appalachian Power Co. v. United States*, 221 Ct.Cl. ——, ——, 607 F.2d 935, 942 (1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).