CHESHIRE HOSPITAL

v.

NEW HAMPSHIRE–VERMONT HOSPITALIZATION SERVICE, INC., d/b/a Blue Cross-Blue Shield of New Hampshire-Vermont; Richard S. Schweiker, Secretary of Health and Human Services.

Civ. No. 81–207–D.

United States District Court, D. New Hampshire.

Dec. 30, 1981.

---

Jon S. Richardson, Manchester, N. H., for plaintiff.

Joseph Stewart, Concord, N. H., for Blue Cross.

W. Stephen Thayer, III, U. S. Atty., Concord, N. H., Clifford Pierce, H.H.S., Boston, Mass., for defendants.

## OPINION

DEVINE, Chief Judge.

The instant action was filed with this Court by Cheshire Hospital ("Cheshire") formerly Elliot Community Hospital, a non-profit corporation doing business in Keene, New Hampshire. The hospital is a 170-bed acute-care, general short-term facility. It provides services to both private and Medicare patients. This lawsuit arises from a dispute over payment for the costs of services to Medicare patients, which is governed

1. The bond issuance was for $9,450,000 worth of hospital revenue bonds.

2. All references to the 794-page record of this case submitted to this Court with defendant's answer shall be by reference to the transcript ("Tr.") page.

3. Richard B. Stewart, Secretary and Executive Director of both the New Hampshire and the

by the Medicare Act ("Medicare"), formally entitled the Health Insurance for the Aged Act, adopted as part of the Social Security Act of 1965, Pub.L.No.89–97, 79 Stat. 291 (and codified at 42 U.S.C. § 1395, *et seq.*)

Cheshire Hospital is a "provider of services" for Medicare purposes, 42 U.S.C. § 1395x(u), and receives the "reasonable cost of such services", 42 U.S.C. §§ 1395f(b), 1395x(v), from the Secretary of Health and Human Services ("Secretary"), who acts through his fiscal intermediary. The Secretary's fiscal intermediary for Cheshire Hospital for the fiscal year here at issue, which ended June 30, 1977, was New Hampshire-Vermont Hospitalization Service, Inc. ("Blue Cross").

Specifically, this dispute arises from the accounting of certain funds connected with the financing of a new hospital facility. In 1971, in order to finance the construction of a new hospital building, Cheshire entered into an agreement with the New Hampshire Higher Education and Health Facilities Authority ("Authority") whereby bonds were issued and the resulting revenue was placed in several different funds.[1] It appears that at the time this approach was taken to finance the construction, *i.e.*, utilizing the Authority's ability to issue tax exempt bonds, it was a relatively new method for all concerned. *See* Tr.[2] 78–79.[3]

As stated above, the bond sale proceeds were placed in several different funds. The Authority's General Bond Resolution, *see* Tr. 653–714, referred to these funds as the construction fund, the revenue fund, the operating fund, the debt service fund, the debt service reserve fund, the project reserve fund, and the redemption fund. Tr. 677. *See also* Authority's Series Resolution, Tr. 716–26. The fund primarily involved in

Maine Higher Educational and Health Authorities, testified at the administrative hearing that during the decade 1960–1969 less than $400 million of hospital revenue bonds were issued. That figure was compared with $3.174 billion of hospital revenue bonds issued during the year 1979. "[B]ack in 1971, it was [indeed] a new industry." Tr. 79.

this dispute is the debt service reserve fund ("DSRF"). The purpose for establishing the DSRF was to insure that Cheshire had the ability to make the necessary payments of principal and interest due on the bonds in the event there occurred a deficiency in the debt service fund. The DSRF was funded with proceeds from the bond issuance. The monies were placed under the control of an independent trustee, the Shawmut Bank of Boston ("Trustee"), and since then Cheshire has not had direct control over them. The monies in the DSRF were then invested by the Trustee,[4] with the earnings from said investment being placed first into the DSRF. Any surplus[5] which might exist would flow into the project reserve fund, and similarly any surplus therein would flow into the redemption fund. Tr. 724–25. When the redemption fund is of sufficient size to retire the remaining debt on the bond issuance, the Trustee, upon notification from the Authority, shall cause a redemption of the outstanding bonds to occur. Tr. 675–76, 710–11.

The issue herein arises in the context of what is the "reasonable cost" of services which Cheshire has provided to Medicare patients and for which Cheshire is entitled to payment pursuant to Medicare. *See* 42 U.S.C. § 1395f(b). It is settled between the parties that the construction of this facility was necessary and that Cheshire is entitled to partial reimbursement for the interest payments which it incurs due to the bond issuance in proportion to the Medicare patients served. *See* 42 U.S.C. § 1395x(v)(1)(A) (allowing reimbursement for both direct and indirect costs incurred in providing services to Medicare patients).

The question before this Court is whether the Secretary may be allowed to deduct the earnings made by investing the monies in DSRF from the reimbursable interest expenses mentioned above. It is a question of first impression.

■ In approaching this issue, we note the appropriate standard of review. In establishing judicial review of the Secretary's action, 42 U.S.C. § 1395oo(f)[6] specifies that the Administrative Procedure Act ("APA") is to govern the proper scope and standard of that review.[7] The APA provides that "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions", and that the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ...."[8] The burden

---

4. The Trustee may invest the monies in the DSRF only in obligations of or guaranteed by the United States or any agency or instrumentality thereof. Tr. 683–84.

5. What constitutes a "surplus" is defined within the documents establishing this bond issuance. *See* Tr. 685–86, 660.

6. 42 U.S.C. § 1395oo(f) provides:
   A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses or modifies (adversely to such provider) the Board's decision. In any case where such a reversal or modification occurs the provider of services may obtain a review of such decision by a civil action commenced within 60 days of the date he is notified of the Secretary's reversal or modification. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions

under chapter 7 of Title 5, notwithstanding any other provisions in section 405 of this title.

7. Chapter 7 of Title 5, referred to in 42 U.S.C. § 1395oo(f) (*see* n. 6, *supra*) is codified at 5 U.S.C. §§ 701–706.

8. 5 U.S.C. § 706, in its entirety, reads as follows:
   § 706. Scope of Review.
   To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
   (1) compel agency action unlawfully withheld or unreasonably delayed; and
   (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

of showing that the Secretary's action was contrary to the standard of review enunciated in 5 U.S.C. § 706 lies with Cheshire. *Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C.Cir.1979). While the decision of the Secretary must be rational and he must give clear indication that he is exercising the discretion with which he is empowered, *id., quoting SEC v. Chenery Corporation*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462–463, 87 L.Ed. 626 (1943), it may be "a decision of less than ideal clarity if the agency's path may reasonably be discerned", *id., quoting Bowman Transportation, Inc. v. Arkansas-Best Freight, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

■ Counsel are at odds concerning the deference to which the Secretary's decision is entitled. In reviewing the applicable case law, we find that "[g]enerally, when the meaning of a provision within the expertise of an agency is involved, the courts will afford deference to that agency's construction", *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 130–31 (9th Cir. 1980). "Even though there may be differing accounting theories, the administrative judgment as to which of the accounting methods 'most appropriately implements the principles of reimbursement under the Medicare Program is entitled to deference.' *Gosman v. United States*, 215 Ct.Cl. 617, 632, 573 F.2d 31, 41 (1978)." *Saint Francis Memorial Hospital v. United States*, 648 F.2d 1305, 1308 (Ct.Cl.1981). Thus, while it is clear that the Secretary's discretion does have limitations, see *St. John's Hickey Memorial Hospital v. Califano*, 599 F.2d 803 (7th Cir. 1979), where the Secretary's position is arrived at in the exercise of his discretion and is reasonably related to the purpose of the statute, *see Batterton v. Francis*, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977); *Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974), such position should be accorded "considerable" deference, *Ford Motor Credit Company v. Cenance*, 452 U.S. 155, 158, 101 S.Ct. 2239, 2241, n.3, 68 L.Ed.2d 744 (1981); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 107, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979). Keeping these standards in mind we turn now to the question before us.

■ The decision of the Provider Reimbursement Review Board ("PRRB"), Tr. 8–15, which became the final decision of the Secretary when he declined further review of the decision, Tr. 1, held that Blue Cross had properly reduced the amount of Cheshire's reimbursement for its interest expenses it had paid under the bond arrangement by $51,995, the amount of earnings it had made from investing the DSRF monies. In so finding, the PRRB relied upon 20 C.F.R. § 405.419(b)(2)(iii), which states in pertinent part that interest expense must "[b]e reduced by investment income, except where such income is from gifts or grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds", Tr. 14.

Plaintiff Cheshire makes several arguments against a "technical" application of this regulation. First, the hospital argues that the "investment income" referred to in 20 C.F.R. § 405.419(b)(2)(iii) must be the investment income *of the provider*. Plaintiff's counsel argues such is not the case here; the income is "held by an independent trustee, provide[s] no benefit to Cheshire Hospital and [is] reported on the hospital's balance sheet only at the behest of

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

the accounting profession". Tr. 20. Further, Stephen Purdy, an accountant with considerable expertise in the field of hospital accounting and first-hand experience with Cheshire's situation, stated that the DSRF is "owned by the [A]uthority, I guess, is the best way to describe ownership". Tr. 138.

The Court finds the Secretary could properly reject this argument. It would only be by way of a hypertechnical analysis that one would find it unreasonable to conclude the investment income at issue was that of the provider, Cheshire. We refuse to take such a tack. The DSRF is required by the Authority in arranging the financial package. *See, e.g.,* Tr. 723. Thus, the DSRF fulfills a requirement which directly and immediately benefits Cheshire in that it complies with the Authority's requirements. Further, it protects the bondholders who invested in the construction of Cheshire's facility and without whom said construction would not have occurred.

Finally, due to the "waterfall effect" of the surplus, it is reasonable to conclude that the earnings which are initially attributable to the DSRF, Tr. 684–85,[9] are then transferred into the project reserve fund and into the redemption fund when an adjustment occurs, which is five days after the initial deposit, Tr. 724–25. It is reasonable to conclude from this arrangement that the earnings, which in actuality are in the redemption fund, are on paper accounted for in the DSRF. Thus, they inure either indirectly to the benefit of Cheshire because the monies contained therein are used to retire outstanding bonds, which is of obvious benefit to Cheshire, or directly, as any surplus existing thereafter would be returned to Cheshire, Tr. 95.

The argument that the earnings inure to the benefit of Cheshire through their accumulation in the redemption fund is countered by the plaintiff. Cheshire stated that such a theory is speculative and would best be addressed in the future by way of recapture when the bond retirement becomes a reality. Defendant argued at the hearing held in this matter that such an analysis is not "speculative", and the Court agrees. While it is not beyond all possibility that these earnings may be moved back up the waterfall and paid out in the event of a deficiency, *see* Tr. 682–83, such eventuality appears to be, at best, unlikely. Further, as pointed out in the foregoing analysis, it is not at all speculative that surplus earnings which are deemed part of the DSRF are in actuality in the redemption fund. *See* n.9, *supra.*

The other aspect of plaintiff's rebuttal on this point does appeal to one's common sense. It appears reasonable to consider allowing plaintiff to proceed now without the earnings reduction until such time as those earnings are utilized to plaintiff's direct benefit, *e.g.,* retiring the outstanding bonds. As Mr. Purdy said, it is a "timing issue". Tr. 153. But the answer to this is that the Secretary, through the PRRB, did consider this and rejected it, instead exercising his discretion in opting for the alternative approach of offsetting those earnings now. We give "considerable" deference to said judgment, *Ford Motor Credit Company v. Cenance, supra,* 101 S.Ct. at 2241, n.3, and find such was not an abuse of discretion, 5 U.S.C. § 706. It certainly is a rational approach where, as here, the plaintiff operates on an accrual method of accounting, Tr. 515, and under such method the fund at issue herein appears on Cheshire's balance sheet, Tr. 20, 112–13. It appears that plaintiff at one point acknowl-

---

**9.** Sections 4.11(b) and (e) of the Authority's General Bond Resolution state in pertinent part as follows:

(b) Interest earned, profits realized and losses suffered by reason of any investment shall be credited or charged, as the case may be, to the fund or account for which such investment shall have been made . . . .

. . . .

(e) In computing the assets of any fund or account, investments and accrued interest thereon shall be deemed a part thereof. Such investments shall be valued at the face value or the current market value thereof, whichever is the lower, or at the redemption price thereof, if then redeemable at the option of the holder.

edged that to find that the earnings here were those of the plaintiff was a discretionary decision for the PRRB, Tr. 55; we agree, and find no abuse in the exercise of said discretion.

■ Plaintiff's next argument concerns the gift and grant exception to offsetting income contained in 20 C.F.R. § 405.-419(b)(2)(iii). Cheshire argues that unlike most hospitals which contribute little or no equity to the bond issuance,[10] plaintiff's contribution was quite substantial. In fact, of the $2,963,000 Cheshire contributed to the facility, $1,745,000 of which was at the time of closing, Tr. 66–68, sufficient amounts were from previous gifts to the hospital that the DSRF could have been fully funded with said gift money, Tr. 69, and then they would have fit under the exception as it literally reads. Upon the advice of professional counsel Cheshire instead contributed the money toward the bond issuance. In reviewing the circumstances the PRRB found that the gift money had lost its character as such when it was so contributed and that the DSRF was funded with bond revenue and therefore did not fit under the exception.

Plaintiff argues that had it been advised to do so it would have placed the contribution directly into the DSRF and therefore they are being penalized for merely drafting, in complete innocence, instruments which do not comport with what they now know to be the Secretary's position.

We repeat that while this argument may appeal to this Court, our judgment in this matter is limited under 5 U.S.C. § 706. Further, plaintiff again appears to acknowledge that the PRRB's decision on this issue was a discretionary one, Tr. 178–80, and once more we agree and find that the Secretary did not abuse his discretion.

The Court also notes that the fact that Cheshire's contribution to the bond issuance affected the interest rates, thereby realizing not only the reduction pointed out by plaintiff, i.e., the amount the Secretary had

to reimburse Cheshire for interest payments, but also a reduction in the amount Cheshire had to pay as well, Tr. 87. By contributing the gift money directly to the DSRF, Cheshire's contribution to the bond issuance itself would have been proportionately decreased, and in so doing the interest rates available may have been affected to Cheshire's (and the Secretary's) detriment. Thus, even had they known in 1971 what the regulation's interpretation would be, this and other factors may have caused the professionals advising them to still recommend the course of action here followed.

There may well have been other aspects which would have had to be factored into the calculus which are not immediately obvious upon review. However, without going any further afield it is sufficient for purposes of this issue to state that it is clear from our review that the Secretary's literal application of the gift and grant exception (causing him to find that the revenue had changed in character and thus was not exempt) is clearly not an abuse of his discretion.

Cheshire also argues against what it considers the retroactive nature of the Secretary's interpretation and application of 20 C.F.R. § 405.419(b)(2)(iii). Plaintiff argues that the testimony of Mr. Purdy clearly indicated that the long-standing industry practice in 1971 was that income in the DSRF was not investment income and thus the rulemaking aspects of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, should have been utilized to change said practice. The Court first questions how "long-standing" said practice was in 1971 when according to Mr. Purdy's testimony the first time this issue arose in New Hampshire or Vermont was in 1974 or 1975, Tr. 114, apparently in the so-called "Rutland case". The Rutland cost report therein at issue was not in fact resolved until 1977. Tr. 156. Coincidentally, the first year at issue here is 1977.

---

**10.** Mr. Stewart, see n.3, supra, stated that in some instances the Authority does 100% fi-

nancing for such issuances, Tr. 87.

However, the complexity of the APA's effect upon the procedure to be utilized by the Secretary causes further analysis. There are three statements (regulations, rules, or policy statements) with which plaintiff could possibly be seen as taking issue. They are 20 C.F.R. § 405.-419(b)(2)(iii); section 226 of the Provider Reimbursement Manual, and the letter from M. F. Splitgerber to Blue Cross dated May 9, 1979, Tr. 359. As both of the first two statements fit within the "benefits exception",[11] causing the APA to be inapplicable thereto,[12] we confine our analysis to the Splitgerber letter.

In January 1979 Blue Cross wrote to the Secretary's Boston regional office "for a policy clarification or maybe just a policy on the treatment of the income for these reserve accounts". Tr. 156. In response thereto, Mr. Splitgerber, Chief of the Contractor Review Branch of the Boston Medicare Bureau, set out in his letter what "represent[ed] current Medicare policy" and the reason for the "change in policy". Tr. 359. Application of the standards set out therein resulted in Blue Cross's reducing plaintiff's claimed expenses, and the administrative hearing, followed by this litigation, ensued.

The question presented by these facts is whether Mr. Splitgerber's letter is a legislative rule and thus subject to the requirements of 5 U.S.C. § 553(c).[13] Conversely, if the letter is an "interpretative rule" or a "general statement of policy", the rulemaking provisions of 5 U.S.C. § 553 do not apply. 5 U.S.C. § 553(b)(A).

Generally speaking, it seems to be established that "regulations", "substantive rules" or "legislative rules" are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means ... 'A substantive rule is one which ... is intended to implement the statutory structure or the statutory powers of an agency. An interpretative rule is one which does not have the full force and effect of a substantive rule but which is in the form of an explanation of particular terms in an Act. If you had an expression in a statute such as "Interurban Railway," the query might come up as to what is an "interurban railway." A particular agency may adopt a rule defining an interurban railway. That, in a sense, may be called an interpretative rule.'

*Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331-32 (D.C.Cir.1952). Although this area of law has become substantially more muddled in the years since *Gibson* was decided, *see generally* K. Davis, Administrative Law Treatise, Chapter 7 (2nd Edition 1979), it is still a correct statement of the law. *Chamber of Commerce of the United States v. O.S.H.A.,* 636 F.2d 464, 469 (D.C.Cir.1980). We find this was an instance where the administrative officer was attempting to construe what 20 C.F.R. § 405.419(b)(2)(iii) meant, and therefore the Secretary was not bound by the requirements of 5 U.S.C.

---

11. The notice and comment requirements of 5 U.S.C. § 553 are inapplicable under subparagraph (a)(2) "to the extent that there is involved ... a matter relating to agent management or personnel or to public property, loans, grants, *benefits,* or contracts". (Emphasis added.)

12. While 20 C.F.R. § 405.419 was promulgated in 1966, *see* 31 Fed.Reg. 14813, and section 226 of the Provider Reimbursement Manual was promulgated as to substance in 1970, *see* Defendants' Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, Exhibits B, C, D, the Splitgerber letter was issued in 1979. The "benefits exception" was waived

by the Secretary in 1971, *see* 36 Fed.Reg. 2532, and thus applies to, but only to, the 1979 letter.

13. 5 U.S.C. § 553(c) reads as follows:

After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

§ 553. *See* Annot., 45 A.L.R. Fed. 12. It was "not finally determinative of the issues or rights to which it was addressed". *Regular Common Carrier Conference v. United States,* 628 F.2d 248, 251 (D.C.Cir.1980). Blue Cross still had to determine whether Cheshire fit within the tests set out in the Splitgerber letter, *i.e.,* section 226 of the Provider Reimbursement Manual, and only when this test was applied were plaintiff's expenses reduced. This decision was then challenged and the PRRB's order, which then became the final decision of the Secretary, rested firmly upon 20 C.F.R. § 405.-419(b)(2)(iii), without ever mentioning the Provider Reimbursement Manual or Splitgerber's letter. The Court also notes the agency did not argue before the PRRB that the Splitgerber letter was binding. Thus, "the agency [did not] apply or rely upon a general statement of policy [or an interpretative rule] as law because [the Splitgerber letter] only announce[d] what the agency [sought] to establish as policy". *Id., quoting Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974). Accordingly, the Court finds the Splitgerber letter is not a legislative rule and therefore not subject to the rulemaking provisions of 5 U.S.C. § 553.

■ This result does not end the APA analysis. Having found that the Splitgerber letter is not a legislative rule but rather is either an interpretative rule or a general policy statement causes us to turn our attention to the provisions of 5 U.S.C. § 552. As stated therein, each agency is required to publish in the Federal Register either "statements of general policy or interpretations of general applicability formulated and adopted by the agency. . . ." 5 U.S.C. § 552(a)(1)(D). Thus, regardless of which this statement by Splitgerber was, either an interpretative rule or a general policy statement, section 552 of Title 5 required that it be published.

However, .subsection (a)(1) also states: "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."

5 U.S.C. § 552(a)(1). It is apparent that Cheshire had actual and timely notice of the Splitgerber letter as plaintiff submitted same as an exhibit at the administrative hearing. Tr. 294. Apart from the due process considerations discussed below, there is no indication by plaintiff that said notice was not timely. *Cf., Appalachian Power Co. v. Train,* 566 F.2d 451, 456 (4th Cir. 1977); *Yassini v. Crosland,* 618 F.2d 1356, 1362 (9th Cir. 1980) (per curiam). The Court therefore finds that the subject matter contained in the Splitgerber letter affected only cost reports under audit review at the time Cheshire received actual and timely notice.

Plaintiff "would have stood in no better stead", *Pesikoff v. Secretary of Labor,* 501 F.2d 757, 763–64, n. 12 (D.C.Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974), if the content of the Splitgerber letter had been published in the Federal Register on May 9, 1979, than it did as a result of the method which was here utilized. "The purpose of publication in the Federal Register is public guidance." *Pitts v. United States,* 599 F.2d 1103, 1108 (1st Cir. 1979). The only cost reports here affected were still under audit review, *i.e.,* 1977 and years subsequent, and this plaintiff received the necessary guidance to make appropriate adjustments in said reports, preserve its rights, and challenge the Secretary's ruling as was here done. Plaintiff's argument that the Splitgerber letter was retroactively applied to a 1971 closed transaction is construed as a constitutional due process argument and is analyzed as such below. Thus the Court finds no violation of the APA under the facts as here presented, and it therefore next considers the Fourteenth Amendment Due Process Clause.

Cheshire's last argument challenges the ruling on the basis of a constitutional due process violation due to its retroactive effect. Cheshire argues that it was entitled to the interest expense without the earned income offset because their transaction was closed in 1971, *i.e.,* the contract with the Authority was signed in 1971, albeit that

the performance of said closed transaction did and will continue for thirty years from said date. Cheshire argues that the contract was entered in reliance upon their interpretation of the regulation at issue.

 Although the agency may not have clearly overruled this accounting method previously, it appears from the record that the Secretary had at best silently acquiesced, Tr. 170, in the use of this method during the years the Authority's funding was first being utilized. Indeed, the fact that plaintiff argues is not that the practice was long-standing with the Secretary, but rather that it was long-standing within the industry. The fact that an industry has a long-standing practice in a given field does not mandate that the agency regulating said field adopt that practice as its own or utilize the APA rulemaking procedure to change how that practice must be approached by the industry. While it may have the same negative economic effect, to rely upon an industry practice to one's detriment does not have the same legal impact as when one relies upon previous agency action. In fact, such reliance as plaintiff alleges here does not in any way implicate due process considerations.

We note that the Authority was the other party to the contract, not the Government nor specifically the Secretary. However, this is not controlling on this issue.[14] What the Court does find controlling is *Saint Francis Memorial Hospital v. United States*, 648 F.2d 1305 (Ct.Cl.1981). In that 1981 Court of Claims case the Court found the type of reliance at issue here did not create an entitlement which is protected by the Due Process Clause of the Fourteenth Amendment. The Court stated that "reliance on one's own interpretation of an imprecise regulation does not create an entitlement based on that interpretation, or a violation of due process when the administrator or court adopts another reading". *Saint Francis Memorial Hospital v. United States, supra* at 1311. Similarly, the indus-

try's interpretation is not that of the agency, and thus it cannot create an entitlement.

In conclusion, based upon careful review of the record before this Court and the thorough briefs and supplemental briefs submitted in this matter, the Court finds and rules for the reasons set forth above that the defendants are entitled to summary judgment as a matter of law. Defendants' motion for summary judgment is accordingly herewith granted.

SO ORDERED.

---

**14.** We decline comment upon how, if at all, this constitutional issue would have been affected

had the Secretary been a party to the contract.