MONONGAHELA POWER
COMPANY, et al.

v.

John O. MARSH, Jr., Secretary,
Department of the Army, et al.,
Appellants,

Federal Energy Regulatory
Commission, Intervenor.

MONONGAHELA POWER
COMPANY, et al.

v.

John O. MARSH, Jr., Secretary, Department of the Army, et al., The Sierra
Club, et al., Appellants,

Federal Energy Regulatory
Commission, Intervenor.

MONONGAHELA POWER
COMPANY, et al.

v.

John O. MARSH, Jr., State of West
Virginia, Appellant,

Federal Energy Regulatory
Commission, Intervenor.

Nos. 81–1201, 81–1203 and 81–1282.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 18, 1982.

Decided Jan. 13, 1987.

James C. Kilbourne, Atty., Dept. of Justice, with whom Carol E. Dinkins, Asst. Atty. Gen., Anne S. Almy and Peter R. Steenland, Jr., Attys., Dept. of Justice, Washington, D.C., were on the brief, for John O. Marsh, Jr., Secretary, Dept. of the Army, et al., appellants in No. 81–1201 and appellees in Nos. 81–1203 and 81–1282.

Ronald J. Wilson, Washington, D.C., for Sierra Club, et al., appellants in Nos. 81–1201 and 81–1203 and appellees in No. 81–1282.

Dennis M. Abrams, Deputy Atty. Gen., State of W. Va., with whom Chauncey H. Browning, Atty. Gen., State of W. Va., Charleston, W.Va., was on the brief, for State of W. Va., appellant in No. 81–1282 and appellee in Nos. 81–1201 and 81–1203.

David I. Granger, with whom Barry J. Israel, Washington, D.C., was on the brief, for Monongahela Power Co., Washington, D.C., et al., appellees in Nos. 81–1201, 81–1203, and 81–1282.

Andrea Wolfman, Atty., F.E.R.C., with whom Charles A. Moore, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for F.E.R.C., intervenor in Nos. 81–1201, 81–1203, and 81–1282.

Before ROBINSON, Circuit Judge, BAZELON, Senior Circuit Judge,* and GASCH,** Senior District Judge.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Federal Water Pollution Control Act Amendments of 1972,[1] in Section 301(a), make generally unlawful the discharge of any pollutant into the navigable waters of the United States.[2] This legislation, however, in Section 404(a), authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for the discharge of dredged or fill material into navigable waters at specified disposal sites.[3] The single issue posed by these consolidated appeals is whether a permit is required to discharge fill material into navigable waters during construction of a hydroelectric facility previously licensed by the Federal Power Commission (FPC).[4]

---

* *Senior Circuit Judge* BAZELON did not participate in the consideration of this opinion.

** Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. Pub.L. No. 92–500, 86 Stat. 816 (1972) (principally codified as amended at scattered sections of 33 U.S.C. (1982)) [hereinafter cited as codified].

2. "Except as in compliance with [designated sections of the Act], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a) (1982).

3. *Id.* § 1344(a) (1982).

4. Section 402(a)(1)(A) of the Department of Energy Organization Act of 1977, Pub.L. No. 95–91, 91 Stat. 565, 583 (codified at 42 U.S.C. § 7172(a)(1)(A) (1982)), transferred FPC authority over the issuance and renewal of hydroelec-

The District Court answered that question in the negative.[5] We disagree.

## I

Monongahela Power Company, on behalf of Allegheny Power System, Inc., applied to FPC for a license to construct a 1000–megawatt pumped-storage hydroelectric facility on the Blackwater River in the Canaan Valley of Tucker County, West Virginia.[6] This project contemplates erection of two dams creating two reservoirs, which would inundate more than 7,000 acres of freshwater wetlands.[7]

An initial decision by an administrative law judge denied the application, finding that the project would devastate the wetlands as a unique and diverse botanical and wildlife habitat.[8] FPC, however, concluded that these admitted losses, though substantial, could be mitigated,[9] and accordingly issued the license.[10]

The project's sponsors, with the Commission's license in hand, then applied to the Army Corps of Engineers for a Section 404(a) permit authorizing them to discharge fill material into navigable waters in the course of construction of the planned hydroelectric facility.[11] The Corps held public hearings, received written comments, and issued a decision denying the permit on the ground that the project would have an unacceptably adverse impact on the Canaan Valley wetlands, and could not be justified on the basis of feasible alternatives.[12]

The Monongahela group then instituted this litigation in the District Court against the Secretary of the Army and other officials.[13] Although Monongahela had invoked the jurisdiction of the Corps of Engineers in its quest for the permit, it now claimed that the Corps had no power to require a permit of an FPC–licensed project.[14] On cross-motions for the summary judgment, the District Court ruled in

tric licenses to the Federal Energy Regulatory Commission (FERC). See text *infra* at notes 66–67.

5. *Monongahela Power Co. v. Alexander,* 507 F.Supp. 385 (D.D.C.1980).

6. *Monongahela Power Co.,* Project No. 2709 (F.P.C. June 10, 1976) at 2, Joint Appendix (J.App.) 159 (administrative law judge's initial decision).

7. *Id.* at 25, J.App. 182.

8. *Id.* at 59, J.App. 216. The judge further found that "none of the proposed mitigation plans appears reasonably appropriate or feasible to effectively outweigh the negative aspects inherent in the adoption of the proposed project, requiring the flooding of a considerable part of the floor of Canaan Valley and radically changing its whole interdependent environment." *Id.* In denying the application as proposed, the judge, however, approved an alternate plan, *id.* at 66, J.App. 223, which would have required inundation of only 700 acres. *Id.* at 36–37, J.App. 193–194.

9. *Monongahela Power Co.,* Project No. 2709 (F.P.C. Apr. 21, 1977) at 28, J.App. 261 (opinion and order).

10. *Id.* The grant of the license is the subject of three petitions for review pending in this court. The court has heard oral argument on these

petitions, but has stayed further proceedings pending resolution of the instant appeals. *Sierra Club v. FERC,* Nos. 77–1736, 77–1737, 77–1845 (D.C.Cir. June 15, 1981) (order).

11. Letter from J.H. Bail, Director, Power Engineering, Allegheny Power System, to District Engineer, United States Army Engineer District, Pittsburgh, Pa., (Jan. 23, 1978), J.App. 58.

12. District Engineer's Findings of Fact at 11, J.App. 695 (July 14, 1978). Like FPC's administrative law judge, see note 8 *supra* and accompanying text, the District Engineer noted that the "muskeg, swamp forest, [and] wet meadows [] harbor a diversity of plants and animals ... made possible only because of the size of the wetlands and the juxtaposition of the habitat types," and declared that the loss of these would be "an irreplaceable one." *Id.*

13. Complaint, *Monongahela Power Co. v. Alexander,* Civ. No. 78–1712 (D.D.C.) (filed Sept. 12, 1978), J.App. 47. We refer to the Monongahela group as Monongahela. The State of West Virginia and six conservation groups were permitted to intervene. More usually we refer to the defendants and these intervenors (all now parties in this court) collectively as the Secretary. Additionally, FERC has intervened in these appeals.

14. Complaint, *supra* note 13, ¶¶ 29–32, J.App. 47–48.

favor of Monongahela.[15] Reaching only the jurisdictional question,[16] the court held that the Corps had no authority to regulate discharges incidental to construction of Monongahela's hydroelectric facility because FPC had already licensed it.[17] Our review thus extends only to that determination.[18]

Monongahela's position, which the District Court accepted, rests on the premise that beginning with the Federal Water Power Act of 1920,[19] Congress consolidated administrative authority over hydroelectric projects, and vested it originally in FPC and thereafter in FERC, its successor.[20] The opposing argument is predicated upon the Federal Water Pollution Control Act Amendments of 1972,[21] which in Section 301(a) broadly declare unlawful "the discharge of any pollutant by any person,"[22] and then in Section 404(a) require a permit from the Corps for any discharge of dredged or fill material into navigable waters.[23] The Secretary points out that Congress expressly exempted enumerated activities from the permit requirement [24] and alluded to no intention to except FPC-licensed hydroelectric projects therefrom.[25] Consequently, the Secretary contends, there is no room for imposition of an implied dispensation for the statutory scheme.

## II

Prior to 1920, the responsibility for licensing and overseeing hydroelectric facilities was dispersed among several arms of the Federal Government, including Congress [26] and the Secretaries of War,[27] Agriculture,[28] and the Interior.[29] Resulting jurisdictional and policy conflicts complicated the expansion of hydroelectric power, and

**15.** *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 392.

**16.** Monongahela had also claimed that FPC's prior licensing decision was res judicata on all issues the Corps could consider, Complaint, *supra* note 13, ¶¶ 38–46, J.App. 49–51; that the Corps was required to hold a formal adjudicative hearing on the permit application and to render a decision on the record, *id.* ¶¶ 47–56, J.App. 52–53; that various ex parte communications between Corps personnel and outside parties had tainted the proceeding and thus deprived Monongahela of due process, *id.* ¶¶ 57–61, J.App. 53–54; and that the Corps' decision was arbitrary, capricious, contrary to law, and not based upon substantial evidence, *id.* ¶¶ 62–66, J.App. 54–55. Since the District Court concluded that the Corps lacked jurisdiction to grant or deny a permit for construction of Monongahela's project, the court did not consider these contentions.

**17.** *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 392.

**18.** See text *infra* at note 118.

**19.** Act of June 10, 1920, ch. 285, 41 Stat. 1063 (current version codified at 16 U.S.C. §§ 791a–825r (1982)).

**20.** Brief for Appellees at 20–29.

**21.** *Supra* note 1.

**22.** 33 U.S.C. § 1311(a) (1982) (quoted *supra* note 2).

**23.** *Id.* § 1344(a). See generally *United States v. Riverside Bayview Homes, Inc.,* —— U.S. ——, ——, 106 S.Ct. 455, 457, 88 L.Ed.2d 419, 424 (1985) (under § 301, "any discharge of dredged or fill materials into 'navigable waters'—defined as the 'waters of the United States'—is forbidden unless authorized by a permit issued by the Corps of Engineers pursuant to § 404"); *P.F.Z. Properties, Inc. v. Train,* 393 F.Supp. 1370, 1381 (D.D.C.1975); *United States v. Bradshaw,* 541 F.Supp. 880, 882 (D.Md.1981); *United States v. Alleyne,* 454 F.Supp. 1164, 1169–1170 (S.D.N.Y. 1978).

**24.** See 33 U.S.C. § 1344(f), (r) (1982).

**25.** Brief for Federal Appellants at 25–27.

**26.** Rivers and Harbors Act of 1899, ch. 425, §§ 9, 10, 30 Stat. 1151 (current version codified at 33 U.S.C. §§ 401, 403 (1982)) (requiring congressional consent to obstructions into navigable waters).

**27.** River and Harbor Act of 1890, ch. 907, 26 Stat. 453 (requiring consent of Secretary of War to abutments beyond harbor line). See also S.Rep. No. 180, 66th Cong., 1st Sess. 3–6 (1919) (history of legislation).

**28.** Act of Feb. 1, 1905, ch. 288, 33 Stat. 628 (current version codified at 16 U.S.C. § 472 (1982)) (authority over hydroelectric facilities on national forest land).

**29.** Act of Feb. 15, 1901, ch. 372, 31 Stat. 790 (authority over facilities on public lands).

led to adoption of a new regulatory regime.[30]

The Federal Water Power Act of 1920[31] created FPC and assigned it the task of licensing and overseeing waterpower projects.[32] The Commission, which originally was composed of the Secretaries of War, Agriculture, and the Interior,[33] assumed "powers [t]heretofore exercised by the Secretaries in connection with waterpower development under their several jurisdictions."[34] As the Supreme Court has recounted, the Act

> was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.[35]

These and other characterizations of the newly-born FPC reflect the centralization of powers previously exercised by other federal entities independently,[36] with the goal of eliminating duplicative work, overlapping functions, and jurisdictional disputes.[37] In this sense, as the District Court noted, FPC's authority is "comprehensive."[38] The exclusivity of FPC's domain is clear, however, only with respect to the functions it inherited upon passage of the 1920 Act. There was, to be sure, a consolidation of extant responsibilities, but certainly no preemption of subsequently-enacted legislation.

A half-century later, Congress made another radical change in legislative policy[39] by adopting the Federal Water Pollution Control Act Amendments of 1972.[40] The product of a strong bipartisan movement in Congress[41] "to restore and maintain the chemical, physical and biological integrity of the Nation's waters,"[42] this enactment

**30.** 3 B. Schwartz, The Economic Regulation of Business and Industry 1821 (1973).

**31.** Act of June 10, 1920, ch. 285, 41 Stat. 1063 (current version codified at 16 U.S.C. §§ 791a–825r (1982)).

**32.** Congress subsequently granted the Commission regulatory authority over electric power and natural gas. See Federal Power Act, ch. 687, tit. II, 49 Stat. 838 (1935) (current version codified at 16 U.S.C. §§ 791a–825r (1982)); Natural Gas Act of 1938, ch. 556, 52 Stat. 821 (codified as amended at 15 U.S.C. §§ 717–717w (1982)).

**33.** Act of June 10, 1920, ch. 285, § 1, 41 Stat. 1063. The Secretaries were replaced by five full-time appointed members in 1930. Act of June 30, 1930, ch. 572, § 1, 46 Stat. 797 (codified as amended at 16 U.S.C. § 792 (1982)).

**34.** S.Rep. No. 180, 66th Cong., 1st Sess. 6 (1919).

**35.** *First Iowa Hydro-Elec. Coop. v. FPC,* 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1143, 1158 (1946).

**36.** See, e.g., *Hearings Before the House Comm. on Water Power,* 65th Cong., 2d Sess. 25 (1918) [hereinafter *Water Power Hearings*] (bill necessary "in order that whatever is done by existing agencies may be done under a consistent plan with a definite end in view") (statement of O.C. Merrill, Department of Agriculture); see generally *Chemehuevi Tribe v. FPC,* 160 U.S.App.D.C. 83, 91–93, 489 F.2d 1207, 1215–1217 (1973) (history of Federal Power Act), *rev'd in part on other grounds,* 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975).

**37.** *Water Power Hearings, supra* note 36, at 26.

**38.** *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 387. See *FPC v. Union Elec. Co.,* 381 U.S. 90, 98–99, 85 S.Ct. 1253, 1258–1259, 14 L.Ed.2d 239, 245–246 (1965).

**39.** See 118 Cong.Rec. 10204 (1972), *reprinted in* 1 Comm. on Environment and Public Works, 93d Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 352 (Comm. Print 1973) [hereinafter cited as Legislative History] (statement of Rep. John A. Blatnik, Chairman, Committee on Public Works). The Committee considered the bill "a landmark in the field on environmental legislation." *Id., reprinted in* 1 Legislative History at 350.

**40.** Pub.L. No. 92–500, 86 Stat. 816 (1972) (principally codified as amended at scattered sections of 33 U.S.C. (1982)).

**41.** See 118 Cong.Rec. 33712 (1972), *reprinted in* 1 Legislative History, *supra* note 39, at 208 (statement of Sen. Tunney).

**42.** 33 U.S.C. § 1251(a) (1982).

marked the ascendancy of water-quality control to the status of a major national priority.[43] Components of this effort were Section 301(a)'s broad ban on discharge of pollutants into navigable waters,[44] and Section 404(a)'s provision authorizing the Secretary to grant permits exempting therefrom the discharge of dredged or fill materials at specific disposal sites.[45]

Congress was aware that the 1972 enactment would have far-reaching consequences,[46] and recognized that some other legislative objectives would have to be reconciled with the new pollution-control efforts. As the chairman of the House Committee on Public Works explained, "[t]hroughout the development of this most important legislation the committee could not forget the broad potential effects [on] competing priorities ... [including] ... energy supply ... and protection of our natural resources."[47] It hardly can be said that the prescription of additional requirements for hydroelectric projects was an utterly unforeseen or inappropriate consequence.

Narrowing our scrutiny to Sections 301(a) and 404(a), we easily discern an effort to halt the systematic destruction of the Nation's wetlands.[48] Congress insisted upon stringent federal discipline in an effort to curb ecological pollution and degradation without interfering unjustifiably with farming, forestry, and other legitimate activities reserved for regulation primarily by local governments.[49] The result was a dual scheme empowering the Corps of Engineers to issue permits pursuant to guidelines promulgated under Section 404(b)(1),[50] authorizing the states to establish and administer their own permit systems for specified discharges upon approval by the Administrator of the Environmental Protection Agency (EPA).[51]

## III

■ Indisputably, construction of Monongahela's proposed hydroelectric facility will entail discharges of dredged and fill material into navigable water.[52] Consequently, Sections 103(a) and 404(a) would seem to require a Corps permit for such

43. 118 Cong.Rec. 10204 (1972), *reprinted in* 1 Legislative History, *supra* note 39, at 350 (statement of Rep. Blatnik).

44. 33 U.S.C. § 1311(a) (1982) (quoted *supra* note 2).

45. *Id.* § 1344(a).

46. See 118 Cong.Rec. 10204 (1972), *reprinted in* 1 Legislative History, *supra* note 39, at 350 ("far-reaching national commitment") (statement of Rep. Blatnik); 118 Cong.Rec. 33712 (1972), *reprinted in* 1 Legislative History, *supra* note 39, at 208 ("decisive redirection in national policy") (statement of Sen. Tunney).

47. 118 Cong.Rec. 10204 (1972), *reprinted in* 1 Legislative History, *supra* note 39, at 352 (statement of Rep. Blatnik).

48. 123 Cong.Rec. 26697 (1977), *reprinted in* 4 Comm. on Environment and Public Works, 95th Cong., 2d Sess., A Legislative History of the Clean Water Act of 1977: A Continuation of the Legislative History of the Federal Water Pollution Control Act, at 869 (Comm.Print 1978) [hereinafter cited as Clean Water Act Legislative History] (statement of Sen. Muskie). Senator Muskie explained the significance of wetlands: "They represent a principle [sic] source of food supply. They are the spawning grounds for much of the fish and shellfish which populate the oceans, and they are passages for numerous upland game fish. They also provide nesting areas for a myriad of species of birds and wildlife." *Id.*

49. *Id., reprinted in* 4 Clean Water Act Legislative History, *supra* note 48, at 869–870.

50. 33 U.S.C. § 1344(b)(1) (1982).

51. *Id.* §§ 1344(g), (h); see United States v. Riverside Bayview Homes, Inc., *supra* note 23, 474 U.S. at 121 n. 1, 106 S.Ct. at 457 n. 1, 88 L.Ed.2d at 424 n. 1 ("[w]ith respect to certain waters, the Corps' authority may be transferred to States that have devised federally approved permit programs"); H.R.Rep. No. 830, 95th Cong., 1st Sess. 100–101 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 284–285 (explaining conference version of state program). EPA may approve a state permit system only if it includes "substantive decisionmaking criteria at least as stringent as [the Section] 404(b) guidelines." 123 Cong.Rec. 38996 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 419 (statement of Rep. Harsha).

52. *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 388.

discharges unless some exemption is available.[53] Although Section 404(f) specifically excludes a number of activities from the permit requirement,[54] it contains no express exception for FPC-licensed hydroelectric projects. We are thus confronted by the question whether such an exception may properly be implied.

In the only case to address the problem squarely, *Scenic Hudson Preservation Conference v. Callaway*,[55] the Second Circuit affirmed a ruling that a Corps permit was needed for the discharge of dredge and fill material incidental to hydroelectric construction despite prior licensure by FPC.[56] The District Court in that proceeding considered and rejected the very argument pressed by Monongahela in the present cases:[57] that an exception to the Federal Water Pollution Control Act Amendments should be inferred on the ground that "Congress could not have intended to interfere with the jurisdiction of the FPC in view of the long-settled policy ... of allowing that agency unique control over the production of hydroelectric power."[58] The court instead concluded that "Congress would not design an Act which on its face is all-inclusive, but for specifically enumerated exceptions, and yet intend to establish an unmentioned exception of the scale suggested...."[59] If Congress desired to exempt FPC licensed facilities, the

court noted, "the remedy rests in Congress' hands...."[60]

Congress amended the Act in 1977,[61] only three years after the Second Circuit affirmed *Scenic Hudson*. If perchance Congress did not care for *Scenic Hudson*, it had an excellent opportunity at that time to overturn it, but it chose not to do so. And the continued omission from the 1977 Amendments, of any exemption for FPC-licensed projects is "striking,"[62] given the fact that *Scenic Hudson* had attached decisive importance to that omission from the 1972 legislation.[63]

The District Court, however, felt that nonetheless the impact of *Scenic Hudson* had been "diminished" by two subsequent events.[64] The first was a reference in the Conference Report on the Department of Energy Organization Act of 1977 to "exclusive jurisdiction ... over certain functions transferred from the FPC."[65]

When, in that legislation, Congress restructured the federal approach to energy problems, it reallocated many of the powers theretofore exercised by FPC, including issuance and renewal of hydroelectric licenses,[66] to the newly-created Federal Energy Regulatory Commission (FERC).[67] The Conference Report mentioned this licensing authority as one of the activities

---

53. See 33 U.S.C. § 1344(f)(1) (1982); see also note 23 *supra*. Section 404(f) of the Clean Water Act of 1977, Pub.L. No. 95–217, 91 Stat. 1600 (amending 33 U.S.C. § 1344(f) (1976)), allows structures such as dikes and dams to be *maintained* without a permit, but did not lift the requirement of a permit for *construction* of these structures.

54. See 33 U.S.C. § 1344(f) (1982).

55. 370 F.Supp. 162 (S.D.N.Y.1973), *aff'd per curiam*, 499 F.2d 127 (2d Cir.1974).

56. *Scenic Hudson Preservation Conference v. Callaway, supra* note 55, 370 F.Supp. at 171.

57. See text *supra* at note 20.

58. *Scenic Hudson Preservation Conference v. Callaway, supra* note 55, 370 F.Supp. at 170.

59. *Id.*

60. *Id.*

61. See note 53 *supra*.

62. *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 388.

63. See text *supra* at notes 59–60.

64. *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 388.

65. H.R.Rep. No. 539 (Conf.), 95th Cong., 1st Sess. 75 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 925, 946 [hereinafter cited as Conference Report], pertaining to Pub.L. No. 95–91, § 402(a), 91 Stat. 582 (1977) (codified at 42 U.S.C. § 7172(a) (1982)) ("Section 402(a) describes the exclusive jurisdiction of the [Federal Energy Regulatory] Commission over certain functions transferred from the FPC").

66. 42 U.S.C. § 7172(a)(1)(A) (1982).

67. *Id.* § 7172(a) (1982).

within FERC's "exclusive jurisdiction."[68] The District Court, attributing great significance to the word "exclusive," treated this statement as congressional support for the conclusion that the Corps of Engineers lacked statutory authority over Monongahela's FPC-licensed hydroelectric project.[69] We find that the court erred in doing so.

The Conference Report itself explains the meaning of the terminology the court relied upon. "This exclusive jurisdiction," it said, "consists of functions transferred from the FPC which will be within the sole responsibility of [FERC] to consider and to take final agency action on without further review by the Secretary [of Energy] or any other executive branch official."[70] This category of FERC authority[71] was set off in contradistinction to other vestigial functions of the former FPC, which were either made solely the Secretary's responsibility[72] or left as "incidental power" available to both FERC and the Secretary.[73] Put another way, FERC's "exclusive jurisdiction" simply denoted that it was to be the highest unit in a vertical line with respect to decisions in the areas specified, including licensure; it had nothing to do with a relationship of FERC to other federal bodies on a horizontal line. Thus the conferees' use of the words "exclusive jurisdiction"—

which are not found in the statute itself—is fully and sensibly comprehended without imparting an exaggerated importance to them. It follows that although the Department of Energy Organization Act undoubtedly endowed FERC richly with authority,[74] it did not expand the jurisdiction it derived from its predecessor so as to preclude the Secretary of the Army from exerting his powers over the Nation's navigable waters.[75]

The second event inducing the District Court's belief that *Scenic Hudson's* force had been dissipated was the Supreme Court's 1976 decision in *Train v. Colorado Public Interest Research Group.*[76] As we read *Train,* however, it does not assist the present analysis. The issue there was whether EPA's authority under the Federal Water Pollution Control Act to control the disposal of nuclear waste encompasses materials subject to regulation by the Atomic Energy Commission under the Atomic Energy Act.[77] Although that question bears a superficial resemblance to the one before us, the factor determinative in *Train* is completely absent here. The *Train* Court based its decision upon a "rather explicit statement of [congressional] intent to exclude AEA-regulated materials from the FWPCA."[78] Congress has not, however, manifested comparably any purpose to ex-

68. Conference Report, *supra* note 65, at 75, *reprinted in* [1977] U.S.Code Cong. & Ad.News at 946.

69. *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 389.

70. Conference Report, *supra* note 65, at 75, *reprinted in* [1977] U.S.Code Cong. & Ad.News at 946.

71. See 42 U.S.C. § 7172(a) (1982).

72. See 42 U.S.C. § 7151(b) (1982) (placing functions not vested in FERC under Secretary's authority); *id.* § 7172(f) (exempting certain matters from FERC's jurisdiction); see also Conference Report, *supra* note 65, at 76, *reprinted in* [1977] U.S.Code Cong. & Ad.News at 947.

73. "[T]he Secretary as well as the Commission, may utilize the incidental power contained in the Federal Power Act or the Natural Gas Act." Conference Report, *supra* note 65, at 76, *reprinted in* [1977] U.S.Code Cong. & Ad.News at 947.

74. See S.Rep. No. 164, 95th Cong., 1st Sess. 6.

75. Nor is a second reference to "exclusive" authority cited by the District Court apposite. In *First Iowa Hydroelec. Coop. v. FPC, supra* note 35, the Court sustained FPC's jurisdiction against state regulation, holding that the federal power preempted conflicting state policy. 328 U.S. at 182, 66 S.Ct. at 920, 90 L.Ed. at 1159. This cannot be reliably extrapolated to the proposition that FPC's jurisdiction was exclusive with respect to another federal agency whose relevant powers were conferred long thereafter, and whose primary statutory mission implicates very different objectives.

76. 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976).

77. *Id.* at 3–4, 96 S.Ct. at 1939, 48 L.Ed.2d at 437.

78. *Id.* at 22, 96 S.Ct. at 1948, 48 L.Ed.2d at 448; see also *id.* at 24, 96 S.Ct. at 1948–1949, 49 L.Ed.2d at 449 ("the legislative history reflects,

clude FPC-licensed hydroelectric projects from Section 404(a)'s permit requirement when otherwise applicable. On the contrary, as we have seen, Congress omitted hydroelectric installations from the list of facilities specifically exempted from that requirement, and did not articulate an exclusionary intent even in the face of the inclusionary judicial interpretation announced in *Scenic Hudson*.[79]

Moreover, the posture of *Train* was the exact converse of that of the case before us. There EPA had adopted regulations exempting from its licensing program all materials covered by the Atomic Energy Act.[80] Here the Corps of Engineers had promulgated a regulation explicitly requiring a Section 404(a) permit for "[a]ny part of a structure or work licensed by the Federal Power Commission that involves the discharge of dredged or fill material into the waters of the United States."[81] The deference due an agency's construction of its governing statute[82] fortifies the dissimilarity of the two cases.[83]

on balance, an intention to preserve the preexisting regulatory plan") (footnote omitted).

**79.** See text *supra* at notes 59–63.

**80.** *Train v. Colorado Pub. Interest Research Group, supra* note 76, 426 U.S. at 8, 96 S.Ct. at 1941, 48 L.Ed.2d at 440.

**81.** 33 C.F.R. § 323.3(e) (1982). In July, 1982, shortly after submission of this case, the Corps of Engineers revised the regulations affecting permits for the discharge of dredged or fill materials into navigable waters of the United States. See 47 Fed.Reg. 31794 (1982) (codified at 33 C.F.R. pts. 320, 323 (1986)). Although the new regulations do not include § 323.3(e), which had expressly required a Corps permit for FPC-licensed projects, the clear effect of the revisions in their entirety is still to mandate a Corps permit for the type of FPC-licensed project sought to be undertaken by Monongahela here. Revised § 323.3(a) provides that

[i]f a discharge of dredged or fill material is not exempted by § 323.4 of this part or permitted by [new] 33 CFR Part 330, an individual or regional Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States. 33 C.F.R. § 323.3(a) (1986). FPC-licensed projects are not expressly exempted from the permit requirements under revised § 323.4. See also *infra* at notes 85–94. Furthermore, new § 330.5(a)(17) would not relieve Monongahela of the burden of obtaining a Corps permit in this case. That section describes a type of project licensed pursuant to the Federal Power Act that would not be subject to the individual or regional permit requirement:

Fills associated with small hydropower projects at existing reservoirs where the project which includes the fill is licensed by the Federal Energy Regulatory Commission under the Federal Power Act of 1920, as amended; has a total generating capacity of not more than 1500 kw (2,000 horsepower); qualifies for the short-form licensing procedures of the Federal Energy Regulatory Commission (see 18 CFR 4.61); and the district or

division engineer makes a determination that the individual and cumulative adverse effects on the environment are minimal....
33 C.F.R. § 330.5(a)(17) (1986). But the project proposed by Monongahela calls for construction of two new reservoirs and a plant with a generating capacity in excess of 1500 kw, see text *supra* at notes 6–7—a project the Corps of Engineers has already found to involve a serious, adverse and irreversible impact on the environment, see note 12 *supra* and accompanying text—and thus a facility subject to the § 404 individual or regional permit requirement as implemented by the revised regulations. Particularly since the parties have not informed us of any inconsistent interpretation of the effect of the new regulations, we can only conclude that the revisions in the regulations to have no significant role in the resolution of the issue in this case.

**82.** See, e.g., *United States v. Riverside Bayview Homes, Inc., supra* note 23, 474 U.S. at —, 106 S.Ct. at 461, 88 L.Ed.2d at 429 (Army Corps of Engineers' construction of Federal Water Pollution Control Act Amendments of 1972 "entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress"); *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90, 99 (1985); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–845, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 701–703 (1984); *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728, 736 (1982); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); *Power Reactor Dev. Co. v. International Union of Elec. Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961); *Capitol Technical Serv., Inc. v. FAA,* 253 U.S. App.D.C. 62, 68, 791 F.2d 964, 970 (1986); *Storer Communications, Inc. v. FCC,* 246 U.S.App.D.C. 146, 150, 763 F.2d 436, 440 (1985); *Eagle Picher Indus., Inc. v. EPA,* 245 U.S.App.D.C. 196, 201 n. 5, 759 F.2d 922, 927 n. 5 (1985).

**83.** The *Train* Court disavowed any dependence upon EPA's interpretation of the Federal Water

We realize that the histories of the pertinent statutes do not themselves conclusively answer the question we face.[84] At this juncture, however, we can conclude only that the Power Act does not provide adequate justification for ignoring the express and unambiguous directive of the subsequently-adopted Pollution Control Act Amendments. Monongahela, however, would have us read into the latter a double-barreled exemption, enabling it to sidestep the anti-discharge mandate of Section 301(a) and simultaneously escape the permit requirement of Section 404(a). We turn, then, to an analysis of Section 404(a) and its express exceptions to determine whether such an implied dispensation for FPC-licensed projects would be in keeping with the statutory scheme.

Pollution Control Act. 426 U.S. at 8 n. 8, 96 S.Ct. at 1941 n. 8, 48 L.Ed.2d at 440 n. 8. We believe, however, that the Corps' construction is a factor properly to be considered since we have no express legislative intent to guide us. See cases cited *supra* note 82.

**84.** Nor does the recent decision in *Escondido Mut. Water Co. v. La Jolla Indians,* 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), aid resolution of the dispute before us. An issue confronting the Court there was whether § 8 of the Mission Indian Relief Act of 1891, 26 Stat. 714, requires a FPC licensee to obtain the consent of an Indian tribe before operating a facility on its reservation lands. Section 8 authorizes private parties to contract with Indians, subject to approval by the Secretary of the Interior, for the right to construct a flume or other appliance for the conveyance of water through Indian lands. Finding nothing in the legislative history of the Act to suggest that Indians were to have any greater right than other private landowners to resist exertions of congressional authority, and citing its earlier ruling in *FPC v. Tuscarora Indian Nation,* 362 U.S. 99, 118, 80 S.Ct. 543, 554, 4 L.Ed.2d 584, 597 (1960), that Congress intended the Federal Power Act to encompass Indian lands, the Court held that the Mission Indian Relief Act did not enable Indians "to override Congress' subsequent decision that all lands, including tribal lands, could, upon compliance with the provisions of the [Power Act], be utilized to facilitate hydroelectric projects." *Id.* at 787, 104 S.Ct. at 2117–2118, 80 L.Ed.2d at 769–770. See, e.g., H.R.Rep. No. 910, 66th Cong., 2d Sess. 8 (1920) (elimination by conferees of proposed amendment to Power Act requiring Indian consent; "no reason why waterpower should be singled out from all other uses

## IV

The exemptions to Section 404(a)'s permit program may be briefly categorized. First, the Corps of Engineers may issue general permits in lieu of requiring individual applications when multiple discharges cumulatively have but minimal adverse environmental effects and the activities contemplated are similar in nature and pass muster under the Section 404(b)(1) guidelines.[85] Second, certain activities leading only to minor discharges are exempt from the permit requirement[86] because Congress felt that they could be more effectively dealt with in "best management practices" reviews[87]—an alternative regulatory approach affording, under the aegis of a state "a degree of protection comparable to that of section 404(b)(1) guideline review."[88]

of Indian reservation land for special action of the council of the tribe"). In the case at bar, unlike *Escondido,* there is no indication that Congress intended FPC-licensed hydroelectric projects to be exempt from compliance with the additional standards established by the Federal Water Pollution Control Amendments of 1972; indeed, we think the statutory scheme signifies the contrary. See text *infra* at notes 85–117.

**85.** 33 U.S.C. § 1344(b)(1) (1982); see H.R.Rep. No. 830 (Conf.), 95th Cong., 1st Sess. 100 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 284; see generally *Riverside Irrigation Dist. v. Andrews,* 758 F.2d 508, 511 (10th Cir.1985).

**86.** 33 U.S.C. § 1344(f)(1) (1982).

**87.** 123 Cong.Rec. 38996 (1977) (statement of Rep. Harsha), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 420–421. The statute allows certain activities to be regulated under an areawide management program instead of by the case-by-case permit scheme of § 404. 33 U.S.C. § 1288 (1982). Activities conducted pursuant to a best-management practice must comply with the Section 404(b)(1) guidelines. *Id.* § 1288(b)(4)(B)(iii).

**88.** See 123 Cong.Rec. 39187 (1977) (statement of Sen. Muskie), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 471 ("[e]ach individual activity or practice must be scrutinized in light of the section 404(b)(1) guidelines and approved by the Administrator before the permit exemption is available").

Activities qualifying for this treatment include normal farming, silviculture, ranching, maintenance, drainage, and road construction.[89] Third, discharges approved under qualified state programs do not need the federal permit.[90] A state program displaces the federal, however, only if the Section 404(b)(1) guidelines strictures are met or exceeded.[91] Finally, a fourth statutory exception exempts those federal projects specifically identified by Congress.[92] To be free of the Section 404(a) permit requirement, the sponsor of such a project must have submitted to Congress an "adequate" environmental impact statement "including consideration of the guidelines developed under" Section 404(b)(1).[93] Of central importance in the House debates was the assurance that consideration and acceptance of the environmental impact statement by Congress would be "equivalent to" review under the Section 404(b)(1) guidelines.[94]

When analyzed in this fashion, Section 404 transmits a crisp and unwavering message: all significant discharges, whether or not exempt from the permit requirement, must be subjected to Section 404(b)(1) scrutiny or its equivalent; some

competent body, be it the Corps of Engineers, EPA, Congress, or the state where the discharge is to occur, must perform a Section 404(b)(1) review.[95] Every type of discharge embraced by an exemption must survive a check of this kind. We think fidelity to the legislative scheme precludes any implication of an additional exemption for FPC-licensed projects when, at the bare minimum, FPC did not subject its license applicants to a review under substantive standards comparable to those established pursuant to Section 404(b)(1).

The factors to be utilized in considering applications for a Section 404 permit are delineated in the implementing guidelines[96] mandated by the statute.[97] The guidelines declare that "[t]he guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources."[98] The guidelines specify additionally that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem...."[99] A series of considerations, warnings, and evaluative techniques comprises many pages of regulations con-

**89.** 33 U.S.C. § 1344(f)(1) (1982); see generally *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 925–926 (5th Cir.1983).

**90.** 33 U.S.C. § 1344(g) (1982).

**91.** See note 52 *supra.*

**92.** See 33 U.S.C. § 1344(r) (1982). This exemption was included in the conference version of the bill in recognition of the constitutional principle of separation of powers. H.R.Rep. No. 830 (Conf.), 95th Cong., 1st Sess. 104 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 288. The narrow nature of this exemption is underscored by the fact that it applies only to discharges integral to construction of designated federal projects. See *id., reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 288; 123 Cong.Rec. 38995 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 416 ("[t]he conferees did not intend to exempt other discharges which may be associated generally with constructing Federal projects, but which are ancillary to the specific activities submitted to and approved by Congress") (statement of Rep. Stark). Accord 123 Cong.Rec. 38997 (1977), *re-*

*printed in* 3 Clean Water Act Legislative History, *supra* note 48, at 420 (statement of Rep. Harsha); 123 Cong.Rec. 39209 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 524–525 (statement of Sen. Baker).

**93.** 33 U.S.C. § 1344(r) (1982).

**94.** 123 Cong.Rec. 39187 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 472 (statement of Sen. Muskie). Accord 123 Cong.Rec. 39209 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 524–525 (statement of Sen. Baker); 123 Cong. Rec. 39210 (1977), *reprinted in* 3 Clean Water Act Legislative History, *supra* note 48, at 529 (statement of Sen. Wallop).

**95.** See notes 85–94 *supra.*

**96.** 40 C.F.R. pt. 230 (1986).

**97.** 33 U.S.C. § 1344(b) (1982).

**98.** 40 C.F.R. § 230.1(d) (1986).

**99.** *Id.* § 230.10(a).

trolling the issuance of permits.[100] Some absolute restrictions are imposed,[101] while other sections address the potential losses to be expected from discharges and the means for minimizing them.[102] These guidelines furnish the yardstick by which the legitimacy of any implied exemption must be measured.[103] If FPC did not subject license applications to some test substantially equivalent to that found in the Section 404(b)(1) guidelines, its action will not measure up to the congressional plan.

The District Court looked to FPC's statutory obligation to regulate in the "public interest,"[104] and the Supreme Court's interpretation of that provision as a call to explore, among other matters, " 'the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wild life.' "[105] But the explicit conservation-oriented Section 404(b)(1) directives under which the Corps labors have nowhere been matched in the mandate given FPC. The District Court undertook a comparison of the Section 404(b)(1) guidelines with those under which FPC operated,[106] and

felt that the latter "echo[] the balancing process" in which the Corps engages.[107] The fact, however, is that aside from other considerations, a critical difference renders the two radically distinct. The FPC guidelines were designed merely to assist license applicants in submitting information to FPC,[108] while Section 404(b)(1)'s are standards governing decisions by the Corps on permit applications.[109] The FPC guidelines imposed no direct restraints on FPC's deliberations or determinations; they did not indicate how FPC should treat the information it received;[110] nor was FPC obligated to seek specific goals in any wise analogous to those the Corps must strive for.[111] Moreover, the FPC guidelines assigned no relative weights to competing objectives, and provided FPC with no more assistance in its review than a general policy of adherence to the aims of the National Environmental Policy Act of 1969.[112] We would do violence to the legislative intent animating the Federal Water Pollution Control Act Amendments were we to find these unchanneled, precatory invitations for information equivalent to the rigorous study demanded of the Corps. Nor can we hold

**100.** The guidelines in effect at the time the Corps of Engineers denied Monongahela a permit provided a more stringent framework for evaluation of its application. See, e.g., 40 C.F.R. § 230.5(b)(8) (1978) ("[d]ischarge of dredged material in wetlands may be permitted only when it can be demonstrated that the site selected is the least environmentally damaging alternative"). These guidelines were replaced with more lenient, but still mandatory, standards for use by the Corps in reviewing applications. 45 Fed.Reg. 85344 (Dec. 24, 1980). The fact that the guideline criteria have been eased since Monongahela's permit application was denied is of no consequence here since, as will appear, FPC did not subject Monongahela's license application to scrutiny comparable to either level.

**101.** See 40 C.F.R. § 230.10 (1986).

**102.** See, e.g., id. §§ 230.50(b), 230.51(b), 230.-52(b).

**103.** The Corps also considers the standards set forth in 33 C.F.R. § 320.4 (1986), which include an assortment of additional factors.

**104.** See 16 U.S.C. § 797(e) (1982).

**105.** Monongahela Power Co. v. Alexander, supra note 5, 507 F.Supp. at 391 (quoting Udall v. FPC,

387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869, 883 (1967)).

**106.** Monongahela Power Co., supra note 5, 507 F.Supp. at 391 (referring to 18 C.F.R. §§ 2.80–2.-81 and app. A (1979)).

**107.** Id.

**108.** 18 C.F.R. pt. 2, app. A(1) (1986) (quoted infra note 110).

**109.** 40 C.F.R. § 230.2(b) (1986) ("[t]hese Guidelines will be applied in the review of proposed discharges") (emphasis added).

**110.** "These guidelines ... [i]dentify the kinds of information to be supplied by applicants to assist Federal Power Commission staff in an independent assessment of major Federal actions significantly affecting the quality of the human environment[.]" 18 C.F.R. pt. 2, app. A(1) (1986).

**111.** See text supra at notes 96–103 and note 109 supra.

**112.** See 18 C.F.R. pt. 2, app. A(4)–(8) (1986).

that the mere existence of an implied general obligation on FPC's part to consider conservation factors in its deliberations [113] created a format for decisionmaking, the absence of which is the crux of the present problem.

■ Given the two statutory sections and their respective legislative histories, congressional intent would be betrayed by implication of an exemption of FPC-licensed hydroelectric projects from the express requirements of the Water Pollution Control Act Amendments.[114] We do not view this as a "repeal" of FPC authority [115] but as a reconciliation [116] seen by Congress as necessary to ensure the protection of a vital national interest.[117]

The judgment appealed from is reversed. Concluding, as it did, that FPC's licensing of Monongahela's hydroelectric project immunized it from an exercise of the Corps' accustomed authority, the District Court did not address other contentions pressed by Monongahela.[118] Accordingly, we remand the case in order that it may now do so, and engage in such further proceedings

**113.** See text *supra* at notes 104–105.

**114.** FERC urges us to find that § 401 of the Clean Water Act, 33 U.S.C. § 1341 (1982), provides an alternative to the statutory scheme for gaining an exemption from § 301's ban on discharges of pollutants into navigable waters. Supplemental Memorandum for Intervenor-Appellee at 3–6. Section 401 provides that

[a]ny applicant for a federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates.... No license or permit shall be granted until the certification required by the section has been obtained....

33 U.S.C. § 1341(a)(1) (1982). According to FERC, § 301 should be construed to allow permitting under § 401(a)(1), comprised of review by a state coupled with the grant of a permit or license under any one of a number of federal regulatory schemes, including the Federal Power Act. Supplemental Memorandum for Intervenor-Appellee at 4–6.

We reject this interpretation. FERC's approach is completely at odds with the plain language of § 301, which expressly describes the contours of permissible discharges: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a) (1982). Section 301 thus does not tolerate attempted avoidance of its ban through an application of § 401, which is omitted from § 301's enumeration of statutory sections. Furthermore, the legislative history of § 401 reveals that the quoted provision was intended merely to assure that "any water quality requirements established under State law, more stringent than those requirements established under [the Clean Water Act], also shall through certification become conditions of any Federal license or permit." S.Rep. No. 92–414, 92d Cong., 1st Sess. 69 (1971). This history indicates no more than that state standards of water quality were to be preserved under the Clean Water Act, see *EPA v.*

*State Water Resources Control Bd.,* 426 U.S. 200, 219, 96 S.Ct. 2022, 2031, 48 L.Ed.2d 578, 591 (1976); *United States Steel Corp. v. Train,* 556 F.2d 822, 830 (7th Cir.1977), and supports no suggestion that § 401 was intended in any way to supplant the need for obtaining a Corps permit. Lastly, FERC's proposed permitting scheme is inconsistent with our conclusion that FPC review of dredge and fill activities under the Federal Power Act is inadequate when measured against § 404(b)(1) guidelines. See notes 96–113 *infra* and accompanying text.

**115.** See *Monongahela Power Co. v. Alexander, supra* note 5, 507 F.Supp. at 391.

**116.** We are advertent to the maxim that repeals by implication are not favored. E.g., *Watt v. Alaska,* 451 U.S. 259, 266–267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80, 88 (1981); *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290, 301 (1974); *United States v. Hansen,* 249 U.S.App.D.C. 22, 26, 772 F.2d 940, 944 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986). By giving appropriate effect to both statutory provisions, however, we repeal no legislation; on the contrary, we fulfill congressional intent. See, e.g., *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815, 842 (1984) (where two statutes are "'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective'") (citations omitted); *McKelvey v. Turnage,* 253 U.S.App.D.C. 126, 138, 792 F.2d 194, 206 (1986) (opinion concurring in part and dissenting in part) (no need to find implicit repeal where "there is no necessary conflict between the [two] statutes").

**117.** As it aptly has been said, "the Federal Power Act is not immune from effects of other subsequent acts of Congress." *Appalachian Power Co. v. United States,* 607 F.2d 935, 941, 221 Ct.Cl. 398 (1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).

**118.** See note 16 *supra.*

consistent with this opinion as may become necessary.

*So ordered.*